Filed 7/30/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                )
)
     Plaintiff and Respondent,   )
)          S180612
     v.                )
)      Ct.App. 6 H034154
CHRISTINE BARRETT,       )
)      Santa Clara County
     Defendant and Appellant.   )  Super. Ct. No. MH034663
_____)

Christine Barrett is an adult who has long been diagnosed with mental retardation and other mental disorders, and who has lived in the community while being supported and supervised by others. Because of her increasingly violent behavior, Barrett became the subject of this proceeding to civilly commit her as a "mentally retarded person" who is a "danger" to herself or others. (Welf. & Inst. Code,[1] § 6500 (section 6500).)[2] The People sought placement in a secure treatment facility pursuant to the statutory scheme.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] Barrett suggests that "mental retardation" and closely related phrases are outmoded expressions for persons with subaverage cognitive and adaptive functioning, and that California courts should speak only in terms of persons who are "developmentally disabled" or "intellectually disabled." A similar point is made in the lone amicus curiae brief filed in this court, which was submitted by Disability Rights California on behalf of itself and other entities and individuals. The terms "mentally retarded" and "mental retardation" appeared throughout the

*(footnote continued on next page)*

Following a nonjury trial in which Barrett was represented by counsel, the trial court sustained the allegations of the petition. The court ordered her committed for one year to the State Department of Developmental Services (Department), and otherwise approved the requested placement. The judgment was affirmed on appeal. This court granted Barrett's petition for review.

We now decide whether the Court of Appeal properly rejected Barrett's claims that she was denied due process and equal protection of the law insofar as the record does not reveal the circumstances under which she was tried by the court, rather than by a jury. The statutory scheme does not expressly provide either for a right to jury trial or for any related requirement that an alleged mentally retarded person be advised of, or allowed to personally act upon, any such right. Nevertheless, the parties do not dispute that Barrett was entitled under longstanding equal protection principles to a jury unless a jury was validly waived.

Critical here is that Barrett further insists the trial court was constitutionally compelled to (1) expressly advise her that she could request a jury, and (2) obtain her personal waiver of a jury, before holding a bench trial and deciding all

---

*(footnote continued from previous page)*

statutory scheme when the present commitment proceedings were held and the findings under review were made. To avoid confusion, we use such original terminology here, and cite the version of the statutory scheme applied to Barrett at all stages of the present case. Nonetheless, we are aware that legislative enactments and proposed amendments replace references to "mental retardation" under section 6500 et seq. with such terms as "developmental disability" and "intellectual disability." (See Assem. Bill No. 1472, approved by Governor, June 27, 2012 (2011-2012 Reg. Sess.); see also Sen. Amend. to Assem. Bill No. 2370 (2011-2012 Reg. Sess.) June 20, 2012.) As suggested by both Barrett and Justice Liu's concurring and dissenting opinion, however, nothing in this new or pending legislation appears on its face to concern either the right to jury trial or the ancillary procedures at issue here.

2

commitment issues itself.  Because the record does not show whether such procedures occurred here, Barrett views the commitment order as inherently unsound and reversible per se.  We disagree, and find no constitutional violation.

Barrett's due process and equal protection theories share the same flawed premise.  The section 6500 procedure itself undermines Barrett's assumption that persons alleged to be mentally retarded and dangerous can necessarily decide for themselves, in a knowing and intelligent manner, whether to demand a jury at their commitment trials.  As we explain, that process is initiated, and proceeds from the outset, on the basis of strong evidence that the individual facing commitment has cognitive and intellectual impairments that would prevent him or her from making a meaningful decision whether to invoke, or waive, the right to a jury trial.  The person's rights and interests are nonetheless protected by the state's statutory obligation to provide counsel in section 6500 proceedings.

Accordingly, consistent with closely related decisions of this court, and given the mental competence issues addressed in section 6500 proceedings as compared to other commitment scenarios, we conclude it is *counsel* who must make the tactical decision whether to seek or waive a jury.  To encumber the jury trial right with a collateral requirement that any waiver be *personally* made by the proposed committee following a formal court advisement would serve no useful purpose in this context.  This approach does not undermine the fairness of the proceedings in a due process sense, or treat dangerous mentally retarded persons differently from those with whom they are aligned for equal protection purposes. We therefore will affirm the judgment.

## I.  CASE HISTORY

On January 22, 2009, the district attorney, acting on the People's behalf, filed a petition in Santa Clara County Superior Court to commit Barrett under

3

section 6500. According to the petition, Barrett lived in a private residence with staff assistance. The party responsible for her care, maintenance, and support was the San Andreas Regional Center (Center).[3] The Center's service coordinator, Betty Crane, was the person who requested that the petition be filed.

The petition further alleged that Barrett was mentally retarded and dangerous to herself and others. On this basis, the court was asked to hold an evidentiary hearing and to order Barrett committed to the Department for care, custody, and treatment for a period not exceeding one year. In providing reasons for filing the commitment petition, the district attorney relied on "the assessment, evaluations, reports and other documents" of the Center and the Department. These materials were incorporated by reference into the petition, and were filed at the same time in the form of a confidential exhibit.

On the day the petition was filed, the trial court set a hearing for March 9, 2009. Pending the hearing, the court also ordered Barrett's interim placement under the Department's care in a particular secure treatment facility.

Counsel for both parties appeared in court on March 9. Although a court reporter was also present, no reported proceedings occurred and no transcript was prepared. As noted by the Court of Appeal, the only record of the hearing is a printed minute order. It indicates, in an abbreviated handwritten note, that the matter was continued to April 8, 2009, at 10:00 a.m., for a two-hour hearing. The March 9 minute order contains no other substantive information.

---

[3]    The Center is one of several regional, community-based nonprofit agencies funded and regulated by the state to serve developmentally disabled persons, pursuant to the Lanterman Developmental Disabilities Services Act (LDDSA). (See § 4620; see also *post*, at p. 11, fn. 10.)

4

On April 8, the trial court began the proceeding at the scheduled time. Barrett and counsel for both parties were present in the courtroom. Counsel agreed that the previous two-hour estimate accurately reflected the total amount of time needed to present evidence and try the case. The People then called Dr. Robert Thomas, their first and only witness, to the stand. Nothing in the reporter's transcript indicates that any mention of trial by jury occurred.

Dr. Thomas was a psychologist at the Center who qualified as an expert witness on mental retardation, and who had examined Barrett and reviewed her case history. He testified that Barrett, then age 27, was mentally retarded. She had an I.Q. in the "50's to 40's" — a level deemed "moderate" in the sense that it was neither mild nor severe. Dr. Thomas based this conclusion, in part, on school records and psychological reports from early in Barrett's life, before she became a client of the Center in 2001.[4]

Dr. Thomas further opined that because of cognitive deficits associated with her mental retardation, Barrett had serious difficulty controlling her behavior, and was a danger to herself and others. This determination rested on two main factors: (1) Barrett's incapacity "to understand the complexity of her disorder and the need for treatment," and (2) her volatile and violent history, as set forth in "incident reports" compiled by the Center.[5]

---

[4]    Dr. Thomas noted near the end of his direct examination that Barrett had been diagnosed over the years with various mental disorders in addition to mental retardation. They included autism, bipolar disorder, schizophrenia, and schizoaffective disorder.

[5]    On cross-examination, Dr. Thomas acknowledged that other mental disorders besides mental retardation can trigger aggression, including autism and schizophrenia. However, in Barrett's case, he declined to blame her violent outbursts either solely or primarily on any diagnosed mental disorder other than mental retardation. While such conditions likely interacted to affect her behavior,

*(footnote continued on next page)*

Dr. Thomas explained that Barrett had lived at home with her parents until 2001.  Because of physical assaults and verbal abuse against her parents, and noncompliance with her treatment plan, Barrett was placed in a residential facility, or group home.  This facility, where Barrett stayed for five years, was well staffed and closely monitored.  However, according to Dr. Thomas, Barrett repeatedly left the premises without proper notice and supervision, and disrupted the community by "threatening people" and acting in "inappropriate" and "self-destructive" ways.  Similar problems arose inside the facility, often triggering an emergency response and psychiatric hospitalization.

Dr. Thomas testified that, beginning in 2006, Barrett was moved into a condominium that her parents owned.  This arrangement was facilitated by support staff trained to help persons like Barrett live independently.  According to Dr. Thomas, Barrett's outbursts continued.  The Center documented 30 incidents in the 18-month period before the hearing.  Typically, Barrett became agitated about personal matters, and responded by assaulting family members or staff, damaging property, and committing certain forms of self-abuse.  Dr. Thomas noted that "furniture and pictures and all kinds of things had to be removed from her apartment just to keep her safe."[6]

---

*(footnote continued from previous page)*

and it was difficult to distinguish between them in that sense, the "limited cognitive ability" associated with mental retardation played a central role in causing her dangerousness.  According to Dr. Thomas, it was Barrett's inability to understand that she was mentally disordered and needed treatment that most impaired her past progress and prognosis.

[6]     For example, in September 2008, Barrett was "obsessing" at home about her hair color when she learned her mother would arrive soon.  Barrett became upset, broke a chair and other furnishings, and was restrained by staff when she showed aggression toward her mother.  Barrett then locked herself in the

*(footnote continued on next page)*

In light of this evidence, Dr. Thomas recommended that Barrett be committed to a particular secure treatment facility — the same one that was serving as interim housing at the time of the hearing. He explained that it was the least restrictive placement. Barrett's history showed that she could not safely reside in either a less secure group home or an independent living situation.

Barrett testified as the only witness on her behalf. She did not like her current placement because, even though the people were nice and the food was good, she could not go on outings and preferred the group home. She liked her medication because it calmed her, but denied being mentally disordered.

Following closing argument, the trial court found that, notwithstanding any other disorders, Barrett was mentally retarded and dangerous under section 6500, and that the danger she posed to herself and others was based upon, and caused by, her mental retardation. She was committed to the Department for one year beginning on April 8, 2009, the date of the hearing. The court designated the

---

*(footnote continued from previous page)*

bathroom, but became docile when the police arrived and took her to a psychiatric unit for evaluation. Later that month, Barrett was crying in her bedroom when she suddenly emerged and punched holes in the walls. She threw a glass bowl at a window, breaking the window on the second try. Two months later, in December 2008, Barrett refused to leave home for a mental health appointment. She threatened to harm staff, destroyed property, and purposefully scratched her face to make it bleed. This episode triggered a 9-1-1 call and admission to a psychiatric unit. Finally, two incidents occurred in January 2009. First, Barrett came home upset after attending church with her parents. She assaulted staff and was hospitalized for emergency psychiatric care. Later that month, at the Center, Barrett cursed and angrily announced that she had changed her name. She threatened to harm staff with a knife, and then entered the bathroom and scratched her arm.

secure treatment facility then being used as interim housing as the least restrictive and most appropriate placement.**7**

On appeal, Barrett focused on the lack of a jury at her commitment trial. Based on the premise that she had a constitutional right to a jury decision on the allegations of the petition, Barrett argued that due process and equal protection principles were violated insofar as the record did not show that the trial court advised her of the right to a jury, or elicited a valid waiver of that right before holding a bench trial. She relied on two cases — both from the Third District Court of Appeal — imposing these requirements in section 6500 proceedings. (*People v. Alvas* (1990) 221 Cal.App.3d 1459 (*Alvas*); see *id*. at pp. 1463-1464 [recognizing equal protection right to personal jury advisement like the one given to dangerous mentally ill persons under § 5302 of the Lanterman-Petris-Short (LPS) Act], pp. 1464-1465 [concluding that jury waiver is uninformed and invalid for due process purposes absent an express personal advisement]; accord, *People v. Bailie* (2006) 144 Cal.App.4th 841, 847 (*Bailie*) [reaffirming *Alvas* on equal protection grounds, and declining to reexamine *Alvas's* due process analysis].)

---

**7**     The trial court scheduled a followup hearing in July 2009, to review the complex nature of Barrett's diagnosed disorders, and to ensure the best placement and treatment options over the long term. The court contemplated that, in the ensuing three-month period, either the Center or Barrett's treatment facility would conduct a full evaluation of her psychiatric history. No further testing was ordered. The record contains no other information about the July 2009 hearing or about any other trial court proceeding after the April 2009 commitment hearing. Indeed, we infer that the original commitment order "expire[d] automatically" by its own terms one year after it was made (§ 6500), and that it therefore is technically moot. Because the issues are of recurring importance and properly presented by the parties, we decide the case on the merits. (See, e.g., *Conservatorship of John L.* (2010) 48 Cal.4th 131, 142, fn. 2 (*John L.*), and cases cited; *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 167, fn. 2 (*Hofferber*), and cases cited.)

8

Here, however, a unanimous Sixth District Court of Appeal panel rejected the Third District's approach as an aberrant departure from settled law. The instant Court of Appeal observed that except for *Alvas, supra*, 221 Cal.App.3d 1459, and *Bailie, supra*, 144 Cal.App.4th 841, California courts have never placed any procedural conditions on the manner in which the defense demands or declines a jury under section 6500. This approach warranted rejection of Barrett's constitutional claims, the court said, because her competence on jury trial matters was in doubt given the nature of the issues raised under section 6500. The Court of Appeal further reasoned that the failure of the defense to request a jury generally waives the right, and that the apparent absence of such a request here precluded a finding that a jury had been wrongly denied. The judgment was affirmed. Barrett sought review.

## II. STATUTORY BACKGROUND

California has no fewer than nine involuntary commitment procedures that may apply to persons who have various mental problems, and who pose a threat to their own welfare or to the safety of others. Some of these laws, including section 6500 et seq., operate in a manner largely independent of the criminal justice system. (See §§ 4825 [developmentally disabled persons under the LDDSA], 5000 et seq. [mentally ill persons under the LPS Act].) Others apply depending on whether a criminal prosecution has occurred. (See § 3000 et seq. [narcotic addicts whether or not they have been convicted of crimes].) Certain accused criminals may receive a mental health commitment in lieu of conviction and punishment. (See Pen. Code, §§ 1026-1027 [defendants acquitted by reason of insanity], 1367 et seq. [defendants found mentally incompetent].) Also, dangerously disordered offenders may be held upon discharge by the juvenile authorities (see Welf. & Inst. Code, § 1800 et seq.), or after serving a prison term (see § 6600 et seq.

9

[sexually violent predators]; Pen. Code, § 2960 et seq. [mentally disordered offenders]).

The statutory scheme applied here has been in effect for over 40 years.[8] The basic rule is that "no mentally retarded person may be committed" to the Department "unless he or she is a danger to himself or herself, or others." (§ 6500.) Dangerousness includes a finding of incompetence to stand trial under Penal Code section 1367 et seq., for accused criminals in certain serious and violent cases. (Welf. & Inst. Code, § 6500.) For mentally retarded persons under the care or treatment of a state hospital or other facility when the petition is filed, proof of a recent overt act is not needed to find them to be a danger to themselves or others. (*Ibid.*)

A section 6500 proceeding commences under certain conditions. First, designated persons "may request" that a petition for commitment be filed by an "authorized" official, as discussed further below. (§ 6502.)[9] In general, individuals allowed to make this "request" are those charged with the support of the mentally retarded person, are representatives of the juvenile or criminal justice

---

[8]    See former section 6500.1, added by Statutes 1970, chapter 351, section 3, page 765, and renumbered as section 6500 and amended by Statutes 1978, chapter 1319, section 2, page 4316; see also sections 6502-6512 (exclusive of § 6504.5), added by Statutes 1967, chapter 1667, section 37, page 4107, operative July 1, 1969.

[9]    Section 6502 states, in pertinent part: "The following persons may request the person authorized to present allegations pursuant to Section 6500 to file a petition for commitment: [¶] (a) The parent, guardian, conservator, or other person charged with the support of the mentally retarded person. [¶] (b) The probation officer. [¶] (c) The Youth Authority. [¶] (d) Any person designated for that purpose by the judge of the court. [¶] (e) The Director of Corrections. [¶] (f) The regional center director or his or her designee. [¶] The request shall state the petitioner's reasons for supposing the person to be eligible for admission thereto, and shall be verified by affidavit."

system, are designated by the court, or — as in the present case — serve as the director of a regional center, or as his or her designee. (§ 6502.)[10] This provision appears to assume that the requesting party is familiar with the person sought to be committed, or has access to relevant information about the person's condition and history. Indeed, any "request" made under section 6502 must document or otherwise state "reasons" for asserting that the person is eligible for commitment. Any request containing such information also must be "verified by affidavit." (*Ibid.*)

Second, allegations that a person is mentally retarded and dangerous are presented to the superior court in petition form by either the district attorney or county counsel, as determined by the county board of supervisors. (§ 6500; see § 6502.) Where a petition is filed, the court appoints the director of the regional center, or a designee, to examine the person and submit a written report. (§ 6504.5.)[11] The report must include an evaluation of the person, as well as a

---

[10] Under the LDDSA, regional centers consist of a network of "private nonprofit community agencies" (§ 4620, subd. (b)) with which the state, through the Department, contracts to provide lifetime support directly to developmentally disabled persons and their families. (*Id.*, subd. (a); see § 4512, subd. (a) [defining " 'developmental disability' " to include mental retardation].) Regional centers assess clients by reviewing their diagnostic history, and providing or procuring a wide range of tests and evaluations. (See §§ 4642, 4643.) In each case, the center establishes both a " 'planning team' " (§ 4512, subd. (j)) and an "individual program plan" identifying goals and needs (§ 4646). A high priority is "direct service coordination" (§ 4640.6, subd. (a)), in which services are obtained from providers, vendors, and contractors. (See §§ 4640.7, 4647, 4648.) A regional center employee, or " 'service coordinator,' " prepares individual program plans, secures needed services, and provides placement and monitoring support. (§ 4640.6, subd. (d); see *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 487-488.)

[11] Section 6504.5 states, in pertinent part: "Wherever a petition is filed [under section 6500 et seq.], the court shall appoint the director of a regional center for

*(footnote continued on next page)*

recommendation for placement both on an interim basis pending the evidentiary hearing and after any commitment decision is made. (§ 6504.5, see §§ 6506, 6509, subd. (a).) Relevant factors include the least restrictive residential option needed to achieve treatment goals and maintain public safety. (§ 6504.5.) A separate report along similar lines may be submitted by any developmental center recommended for placement in the regional center report. (*Ibid*.)

Within a limited time after the petition is filed, the court must set an evidentiary hearing. (§ 6503; see § 6504 [notice of hearing].) A suitable interim placement may be ordered pending the hearing, with consideration given to the reports and recommendations of the regional center and any developmental center involved in the case. Again, relevant concerns include the least restrictive arrangement that promotes treatment and protects public safety. (§ 6506.)

---

*(footnote continued from previous page)*

the developmentally disabled established under [section 4500 et seq.], or the designee of the director, to examine the alleged mentally retarded person. [¶] Within 15 judicial days after [such] appointment, the regional center director or designee shall submit to the court in writing a report containing his or her evaluation of the . . . person. The report shall contain a recommendation of a facility or facilities in which the . . . person may be placed. [¶] The report shall include a description of the least restrictive residential placement necessary to achieve the purposes of treatment. . . . [C]onsideration shall be given to public safety. If placement into or out of a developmental center is recommended, the regional center director or designee simultaneously shall submit the report to the executive director of the developmental center or his or her designee. The executive director . . . or his or her designee may, within 15 days of receiving the regional center report, submit to the court a written report evaluating the ability of the developmental center to achieve the purposes of treatment [and] to protect the public health and safety from . . . the person's known behaviors. [¶] The [foregoing] reports . . . shall also address suitable interim placements . . . [under] Section 6506."

12

The process of hearing and commitment includes substantial procedural safeguards. Thus, for persons who lack their own attorney, the court "shall immediately appoint" counsel to represent them. (§ 6500.)[12] The court is also directed to "inquire" into the person's condition, and to thereby enhance the availability of evidence on this issue. (§ 6507.) Thus, the court may subpoena qualified physicians and psychologists to examine the person and to testify about his or her "mentality." (*Ibid*.) The attendance of other witnesses also may be compelled. (*Ibid*.; see § 6508 [authorizing witness fees and expenses].)

The requisite findings of mental retardation and dangerousness allow the person to be "committed to the [Department] for suitable treatment and habilitation services." (§ 6509, subd. (a).) The same statute requires selection of the "least restrictive residential placement" to meet these goals, identifies a range of available facilities (e.g., state hospitals and community care centers), and permits other appropriate dispositions (e.g., conditional release into the community) that do not risk the welfare of the person or the public. (*Ibid*.) Specific procedures guide the court in selecting an appropriate placement, including consideration of the regional center report submitted under section 6504.5. (§ 6509, subd. (a).)

An order of commitment "expire[s] automatically one year after" it is made. (§ 6500.) Subsequent commitments for additional periods may be sought

---

[12] Section 6500 states, in pertinent part: "In any proceedings conducted under the authority of [section 6500 et seq.], the alleged mentally retarded person shall be informed of his or her right to counsel by the court, and if the person does not have an attorney for the proceedings, the court shall immediately appoint the public defender or other attorney to represent him or her."

for persons who remain mentally retarded and dangerous.  Recommitment procedures are "the same as with an initial petition for commitment."  (*Ibid*.)

## III.  DISCUSSION

Preliminarily, no statute by its plain terms authorizes a jury to determine whether someone is mentally retarded and dangerous for purposes of a section 6500 commitment.  The lack of any jury trial provision distinguishes the statutory procedures regulating section 6500 proceedings from most other involuntary commitment schemes, as we discuss further below.

Nevertheless, here, as in the Court of Appeal, there is no dispute that someone facing commitment under section 6500 et seq. has the right to trial by jury on the allegations of the petition.  Neither party rests this premise on any provision of the federal or state Constitution that directly or expressly grants the right to a jury in criminal or civil trials.[13]  Rather, they invoke a long and unbroken line of California appellate court cases holding or assuming — largely on the basis of federal and state equal protection principles affecting fundamental interests — that persons alleged to be mentally retarded and dangerous cannot be denied a jury *altogether* where jury trials are granted by statute to persons alleged to be mentally impaired and dangerous under comparable commitment laws.

---

**13**     See, e.g., the Sixth Amendment to the United States Constitution ("In all criminal prosecutions, the accused shall enjoy the right to . . . an impartial jury"); article I, section 16 of the California Constitution ("Trial by jury is an inviolate right and shall be secured to all, but in a civil cause three-fourths of the jury may render a verdict.  A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel.  In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute").

Thus, persons like Barrett "are entitled to jury trial upon request." (*O'Brien v. Superior Court* (1976) 61 Cal.App.3d 62, 69.)[14]

We now assess the adequacy of this basic rule, and decide whether additional adjunct procedures must be followed in open court for a valid nonjury trial to occur. Each of Barrett's theories under the due process and equal protection clauses of the federal and state Constitutions is examined in turn.

**A. Due Process Claim**

Barrett contends it is not sufficient for federal and state due process purposes that the courts have implied a right to trial by jury to protect the interests at stake in section 6500 proceedings. She claims the jury trial option needs its own supplemental layer of support. In other words, the decision whether to try the case to the court or to a jury belongs solely to the person facing commitment, and it must be made *personally*, not through counsel. Under this view, any waiver of a jury trial is not knowing and intelligent, and is invalid, unless the court first expressly advises the person of that right. Because the record shows no such

---

**14**     See *People v. Wilkinson* (2010) 185 Cal.App.4th 543, 547; *People v. Sweeney* (2009) 175 Cal.App.4th 210, 217-218; *Bailie, supra*, 144 Cal.App.4th 841, 844-847; *Alvas, supra,* 221 Cal.App.3d 1459, 1462-1463; *Money v. Krall* (1982) 128 Cal.App.3d 378, 398 (*Money*); *In re Watson* (1979) 91 Cal.App.3d 455, 459-460; see also *In re Hop* (1981) 29 Cal.3d 82, 92-93 (*Hop*) (holding that developmentally disabled adults who are incapable of protesting or consenting to hospitalization by third parties under § 4825, and who have no statutory hearing rights upon admission, have equal protection hearing rights that include "jury trial on demand," consistent with jury trial statutes in other commitment schemes); see *Hop* at pp. 93-94 (noting that similar constitutional jury trial rule applies in § 6500 proceedings under *O'Brien v. Superior Court, supra*, 61 Cal.App.3d 62, 68-69); *In re Gary W.* (1971) 5 Cal.3d 296, 303-308 (*Gary W.*) (same equal protection rule as to dangerously disturbed persons held for treatment upon discharge from juvenile system under § 1800 et seq., and who had no statutory jury trial right at the time).

15

express advisement and personal waiver here, Barrett insists a structural defect in the proceeding occurred, and that automatic reversal of the judgment is compelled.

The People reply that persons alleged to be mentally retarded should be treated no differently from defendants in certain other kinds of commitment trials who, because of their alleged mental impairments, lack sufficient capacity to personally understand and implement the jury trial right, or to override any contrary decision by counsel. Alluding to the rules generally applicable in civil cases, the People insist a waiver meets due process requirements where, as here, the record does not show that counsel, who presumably made an informed and competent decision in this regard, requested a jury before the section 6500 trial began.[15] The People have the better view.

This court observed long ago that section 6500 proceedings are not criminal in nature, and that commitment under this scheme, though involuntary, is not punishment. (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [denying alleged mentally retarded and dangerous persons an absolute right under § 6500 similar to the one held by criminal defendants not to be called as a witness].) "The sole state

_____

[15] Code of Civil Procedure section 631, subdivision (a) states: "The right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate. In civil cases, a jury may only be waived pursuant to subdivision (d)." Under subdivision (d) of the same section, "[a] party *waives trial by jury* in any of the following ways: [¶] (1) By failing to appear at the trial. [¶] (2) By written consent filed with the clerk or judge. [¶] (3) By oral consent, in open court, entered in the minutes. [¶] (4) *By failing to announce that a jury is required*, at the time the cause is first set for trial, if it is set upon notice or stipulation, or within five days after notice of setting if it is set without notice or stipulation. [¶] (5) By failing to deposit with the clerk, or judge, advance jury fees as provided in subdivision (b). [¶] (6) By failing to deposit with the clerk or judge, at the beginning of the second and each succeeding day's session, the sum provided in subdivision (c)." (Code Civ. Proc., § 631, subd. (d), italics added.)

interest, legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community." (*Cramer v. Tyars*, at p. 137.)

But civil commitment for any purpose can affect liberty and other vital interests. (*Addington v. Texas* (1979) 441 U.S. 418, 425-426 (*Addington*); *People v. Allen* (2008) 44 Cal.4th 843, 862 (*Allen*).) Hence, due process safeguards apply whether the proceeding concerns mentally retarded and dangerous persons (e.g., *Heller v. Doe* (1993) 509 U.S. 312, 330-333 (*Heller*)), or persons suffering from other dangerous disorders needing care and treatment. (E.g., *Addington*, at pp. 420-421, 425-427 [mental illness in the form of paranoid schizophrenia]; *Moore v. Superior Court* (2010) 50 Cal.4th 802, 810, 815 (*Moore*) [diagnosed mental disorder qualifying convicted sex offender as "sexually violent predator"]; *John L., supra*, 48 Cal.4th 131, 142, 150 [grave disability affecting welfare of mentally disordered person].)

Notably, the procedural safeguards required in this context are flexible (*People v. Tilbury* (1991) 54 Cal.3d 56, 68 (*Tilbury*)), and the quantum and quality of the process due depends upon the nature and purpose of the challenged commitment. (*John L., supra*, 48 Cal.4th 131, 150.) In making this determination, the courts weigh, assess, and consider various factors affected by the disputed procedure. Distilled, these considerations involve (1) the various private interests at stake, (2) any competing state or public concerns, and (3) the potential risk of an erroneous or unreliable outcome. (*Ibid*.; see *Moore, supra*, 50 Cal.4th 802, 819; *Allen, supra*, 44 Cal.4th 843, 862-863; *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 538-539 (*Ben C.*).)

Barrett treats the first factor, involving her own due process interests, as salient here. (See *Ben C., supra*, 40 Cal.4th 529, 538.) She observes, and we

17

agree, that section 6500 proceedings potentially involve a significant restraint on liberty. Whether the requisite findings of mental retardation and dangerousness are made by the court or a jury, the person is ordered committed to the Department for up to one year. Recommitment may be sought if the person's condition has not materially changed during that time. Although the least restrictive placement is required under the particular circumstances, several statutory options involve custodial control. They include confinement in a secure facility to treat the mentally retarded person and to protect the public from the dangers that he or she presents. (See §§ 6500, 6509, subd. (a).) Such was the case with Barrett.

In addition, we have said that persons facing commitment have a " 'dignitary interest' " in being informed of the " 'nature, grounds, and consequences' " of the proceeding, and in presenting " 'their side of the story' " before a determination is made. (*Allen, supra*, 44 Cal.4th 843, 862; see *id*. at p. 868 [identifying statutory procedures that protect due process dignitary interests of alleged sexually violent predators under § 6600 et seq.]; accord, *Moore, supra*, 50 Cal.4th 802, 819, 824.) It bears emphasis that Barrett does not highlight this factor, or identify any specific flaws in the statutory scheme in this regard. (See §§ 6502 [petition must be supported by verified "request" from informed party, and must state "reasons" for commitment], 6504 [notice of hearing], 6504.5 [mental examination and written report required by regional center director or designee], 6500 [right to counsel], 6507 [availability of expert testimony and other witnesses on mental retardation].)

As Barrett suggests, the foregoing interests have been deemed sufficiently fundamental to implicate certain constitutional jury trial concerns in commitment cases, at least in those relatively few instances in which a right to trial by jury has not been legislatively prescribed. It does not follow, however, that the jury trial option implied by the courts in section 6500 proceedings is illusory unless

18

accompanied by the ancillary procedures Barrett seeks. Nor do such procedures necessarily amount to independent constitutional rights applicable in every case. Instead, their due process availability depends, in a particular instance, on a careful balancing of the public and private interests described above.

In this regard, Barrett fails to consider, and we must now address, the special character of the commitment proceeding at issue. This consideration undermines her due process claim.

The controlling principles appear in our unanimous decision in *People v. Masterson* (1994) 8 Cal.4th 965 (*Masterson*). There, the defendant was charged by felony complaint with violent crimes. Before the preliminary hearing, the magistrate declared a doubt as to the defendant's mental competence to stand trial. (See Pen. Code, § 1367.) The matter was sent to the superior court for a competence hearing.

For the hearing, a panel of 12 jurors was chosen to hear evidence and decide competence. Shortly before the presentation of evidence was set to begin, counsel for both sides and the defendant were present in court. However, only 11 jurors appeared. The 12th juror apparently was missing. The prosecutor and defense counsel agreed that the matter could be tried by a jury consisting of the 11 panelists in court at the time. When asked by the trial court whether he understood this stipulation, the defendant made clear that he rejected its terms. He told the court that he would " 'rather have 12 jurors.' " (*Masterson, supra*, 8 Cal.4th 965, 967.) When asked pointblank if he objected to the stipulation allowing an 11-person jury, the defendant said, " 'Yes.' " (*Id.* at p. 968.)

Over the defendant's objection, and consistent with counsel's approach, the competence trial was held in front of only 11 jurors. They unanimously found the defendant mentally competent. A different jury then convicted him of the charged crimes. On appeal, the judgment was reversed on the ground that use of an 11-

19

person jury to decide competence over the defendant's personal objection constituted prejudicial error. This court reversed the Court of Appeal.

The critical question in *Masterson* was whether defense counsel could "waive the right to a jury trial entirely," even if the defendant objected. (*Masterson, supra*, 8 Cal.4th 965, 968.) If so, counsel would necessarily have the lesser authority, so to speak, of agreeing to a jury of fewer than the usual 12 persons. (*Id.* at p. 969; see Cal. Const., art. I, § 16; Code Civ. Proc., § 220.)

*Masterson* first emphasized that in all cases, civil and criminal, " 'a party's attorney has general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters . . . .' " Counsel, not the client, " 'is captain of the ship.' " (*Masterson, supra*, 8 Cal.4th 965, 969.)

Of course, an exception to this broad rule exists in *criminal* cases in which the defendant has a state constitutional right to a jury trial that can only be expressly and personally waived. (*Masterson, supra*, 8 Cal.4th 965, 969, citing Cal. Const., art. I, § 16, & *People v. Ernst* (1994) 8 Cal.4th 441.) *Masterson* observed, however, that a mental competence proceeding, though a byproduct of the underlying criminal prosecution, is not itself a criminal action in which the state constitutional requirement of an express personal waiver applies. Nor is it a civil action. It is a " 'special proceeding' " in which the right to trial by jury is wholly statutory. (*Masterson*, at p. 969; see Pen. Code, § 1369, subds. (a)-(f) [describing mental examinations, evidence, argument, and instructions in any "trial by court or jury of the question of mental competence"].)

Against this backdrop, *Masterson* concluded that it "need not decide" whether the statutory nature of the jury trial right in a criminal mental competence proceeding dictates the circumstances under which it can be waived, i.e., whether there are some statutory rights that counsel may not waive on the client's behalf or over his objection. (*Masterson, supra*, 8 Cal.4th 965, 970.) Rather, the validity of

counsel's decision to dispense with a 12-person jury — like the larger question whether to have a jury at all — rested primarily upon "the nature of competency proceedings" and the issues addressed therein. (*Id.* at p. 971.)

*Masterson* then made the following key point: "The sole purpose of a competency proceeding is to determine the defendant's present mental competence, i.e., whether the defendant is able to understand the nature of the criminal proceedings and to assist counsel in a rational manner. [Citations.] Because of this, the defendant necessarily plays a lesser personal role in the proceeding than in a trial of guilt. How can a person whose competence is in doubt make basic decisions regarding the conduct of a proceeding to determine that very question?" (*Masterson, supra*, 8 Cal.4th 965, 971.)

In answering this question adversely to the defendant, *Masterson* relied heavily on *People v. Hill* (1967) 67 Cal.2d 105 (*Hill*). In *Hill*, after both the trial court and defense counsel expressed doubt about an alleged felon's mental competence, a hearing was held in which the defendant received new counsel. For reasons not clear from record, the competence issue was tried by the court, not a jury. The trial court found the defendant competent and he was later tried and convicted of the charged crimes. Ultimately, in *Hill*, this court rejected the defendant's claim that his convictions should be reversed because, in the competence proceeding, he had not personally waived a jury, or been advised either by the court or counsel of his right to request a jury trial.

As noted in *Masterson, supra*, 8 Cal.4th 965, 971, this court made clear in *Hill, supra*, 67 Cal.2d 105, 114, that there is "no duty in a judge" to advise the defendant about his jury trial right in a mental competency proceeding, at least where he or she is represented by counsel. Also, *Masterson* observed, when the preliminary evidence is sufficient to trigger a mental competence hearing, " 'it should be assumed that [the defendant] is unable to act in his own best interests.

21

In such circumstances counsel must be free to act even contrary to the express desires of his client.' " (*Masterson*, at p. 971, quoting *Hill*, at p. 115, fn. 4.) According to *Masterson*, it is settled that, " 'as a matter of tactics counsel may, without consulting defendant, waive defendant's statutory right to demand that a jury decide his competence.' " (*Masterson*, at p. 972, quoting *People v. Samuel* (1981) 29 Cal.3d 489, 496 [summarizing *Hill*].)

Accordingly, *Masterson* held that "counsel may waive the right to a jury trial in a competency proceeding, and the court need not advise the defendant of that right." (*Masterson, supra*, 8 Cal.4th 965, 972.) Hence, *Masterson* concluded, no error occurred insofar as counsel stipulated to a jury of 11 persons. It also made no difference that the defendant in *Masterson* had personally opposed the stipulation in open court. In light of the initial doubts expressed about his mental competence (which the 11-person jury did not sustain), the defendant could not "veto" counsel's professional judgment or decisional authority in jury trial matters. (*Id*. at p. 973.)[16]

---

[16] At one point, *Masterson, supra*, 8 Cal.4th 965, 972, linked its assumptions about a criminal defendant's limited capacity to play a personal role in the competence hearing to what prior cases had called a " 'prima facie showing' " of incompetence. More accurately, the Legislature contemplates that, in the underlying criminal case, the trial court has entertained a "doubt" on competence (Pen. Code, § 1368, subd. (a)) and/or counsel has expressed a similar "belie[f]." (*Id*., subd. (b).) Because due process bars any criminal defendant from being tried while mentally unsound, a competence hearing is required if "substantial evidence" raises a " 'reasonable doubt' "on the issue. (*People v. Lawley* (2002) 27 Cal.4th 102, 131, and cases cited.) Of course, different procedures and formalities accompany a Welfare and Institutions Code section 6500 matter, which does not necessarily arise out of, or have any connection to, a criminal case. This does not mean, however, that before any section 6500 trial, no substantial doubts have been raised about the person's cognitive condition, or that no evidentiary support for the allegations of mental retardation exists. As we shall explain, a section 6500

*(footnote continued on next page)*

22

Not surprisingly, this court has determined that persons who are mentally impaired for reasons *other* than those present in *Masterson, supra*, 8 Cal.4th 965, also cannot " ' "act in [their] own best interests" ' " when committed. (*Id*. at p. 971.) (See, e.g., *Hop, supra*, 29 Cal.3d 82, 90-91 [developmentally disabled adult too incompetent to admit herself to a mental hospital was not competent to protest or consent to hospitalization by third parties under the LDDSA, § 4825, for purposes of determining the voluntariness of the latter process]; *Thorn v. Superior Court* (1970) 1 Cal.3d 666, 674-675 [persons with acute mental disorders requiring involuntary 14-day treatment under the LPS Act, § 5250, lack the capacity to comprehend their statutory rights, or to knowingly decide whether or not to exercise them, and thus require the assistance of counsel].)

Similar logic applies here. No definition of mental retardation appears in section 6500 or elsewhere in the statutory scheme. However, the Legislature has made clear under a neighboring law, the LDDSA, that mental retardation — like cerebral palsy, epilepsy, and autism — constitutes a " '[d]evelopmental disability.' " (§ 4512, subd. (a).) As such, the condition "originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual." (*Ibid*.)

More to the point, it is understood for section 6500 commitment purposes that mental retardation involves " ' "*significantly subaverage general intellectual functioning* existing concurrently with deficits in adaptive behavior," and appearing in the "developmental period." ' " (*Money, supra*, 128 Cal.App.3d 378,

---

*(footnote continued from previous page)*

proceeding begins, and commitment and placement hearings occur, based on verified information and mental evaluations from interested and informed parties.

23

397, italics added [using "generally accepted technical meaning" of mental retardation to hold § 6500 is not unconstitutionally vague]; accord, *Cramer v. Gillermina R*. (1981) 125 Cal.App.3d 380, 387-388; see *Heller, supra*, 509 U.S. 312, 321-325 [accepting premise of Kentucky commitment law, in dispute over constitutional standard-of-proof requirements, that mental retardation is a permanent developmental and learning disability arising before adulthood].)

Of course, as Barrett suggests, a diagnosis of mental retardation can cover a range of intellectual deficits and behavioral phenomena. (*Money, supra*, 128 Cal.App.3d 378, 397.) Still, the significant cognitive and intellectual deficits that the condition entails, which appear early in life and never recede, affect the ability to "make basic decisions" regarding the conduct of the section 6500 proceeding. (*Masterson, supra*, 8 Cal.4th 965, 971.) Such an individual thus plays a limited "personal role" in the case, and must rely on counsel to decide all tactical and procedural matters, such as whether to exercise the jury trial right. (*Ibid*.)

Applying these circumstances to the due process principles discussed above, we disagree with Barrett that "the private interests at stake" play a predominant or dispositive role in the analysis. (*Allen, supra*, 44 Cal.4th 843, 863.) We cannot ignore limits in a section 6500 proceeding on the person's ability to comprehend and control procedural matters, including the decision whether to exercise the right to a jury trial. It follows that the collateral procedures Barrett seeks, involving an express advisement and personal waiver, would have little effect on enhancing either the jury trial right itself or the vital interests it protects. Hence, these factors do not weigh in favor of finding a constitutional violation to the extent the requested procedures were not used at her commitment trial.

Barrett further suggests that such a conclusion violates due process because it improperly "presumes" that a person is mentally retarded before the fact finder has decided the issue. Again, we are not persuaded. As we explain, no section

24

6500 proceeding is brought or pursued in an evidentiary vacuum or without competent support.

First, the filing of a section 6500 petition is requested by a responsible and interested party (e.g., parent, conservator, correctional or probation official, or regional center director), who presents specific information (reasons) for supposing that the person is mentally retarded and dangerous, in need of treatment, and eligible for commitment. The significance of this request, and its role in providing a foundation for the petition and commitment process, is underscored by the verification requirement. (§ 6502.) Here, the petition alleged that a request for commitment was duly made by the Center, which provided Barrett with regular care and support. In the process, the Center submitted assessments, evaluations, and reports necessary to support the allegations that Barrett was mentally retarded and dangerous. These documents were incorporated by reference into the petition and attached as an exhibit for the court's confidential use in the section 6500 case.

Second, where a section 6500 petition is filed, the trial court is entitled to a written report prepared by, or at the behest of, the director of the regional center, following an examination of the alleged mentally retarded person. (§ 6504.5.) Regional centers specialize in assessing and assisting mentally retarded and other developmentally disabled persons on an individual basis. (See *ante*, at p. 11, fn. 10.) Thus, the regional center report obviously serves as a professional pretrial evaluation of the person's history, condition, and behavior, and includes informed recommendations on treatment and placement, including any interim placement pending the hearing. According to the petition here, the Center supplied assessments, evaluations, and reports about Barrett in seeking to commit her as mentally retarded and dangerous under section 6500.

In light of these principles and authorities, we conclude that someone like Barrett, who is alleged to be mentally retarded and dangerous under section 6500,

25

is not in a position to personally assert or waive the right to jury trial, to sufficiently comprehend the jury trial advisement, or to override the views of counsel on the subject. Sole control over such tactical and procedural decisions rests with counsel, whether or not the client has been consulted or objects. Moreover, absent any requirement of a personal waiver, the person facing commitment has no need for an express court advisement of the right to request a jury trial. Thus, no fundamental interest requires us to hold that the nonjury trial in this case violated Barrett's due process rights insofar as the record does not show that she personally declined a jury or was told of the right to request one.

We also agree with the People's related suggestion that the defense must affirmatively and timely request a jury trial, and that the apparent failure to do so, reflected by the lack of evidence in the record that such a request was made, results in a valid and enforceable waiver. (See *ante*, at p. 16, fn. 15 [Code Civ. Proc, § 631, subd. (d)].) As noted, a statutory right to counsel exists under Welfare and Institutions Code section 6500. Counsel is presumed competent and informed as to applicable constitutional and statutory law. This presumption necessarily includes the defense right to seek a jury trial in a section 6500 proceeding, regardless of any court advisement. Counsel also can be expected, where necessary or advisable, to consult with the client about jury trial concerns. (See *John L., supra*, 48 Cal.4th 131, 154-156 [due process claim rejected on the basis of similar assumptions that counsel consulted with the client in an LPS Act conservatorship proceeding under § 5350, and knowingly entered a binding waiver of any presence and trial rights by informing the court of the client's consent].) It follows that where no defense request for a jury trial appears on the record, we can properly infer that this omission and the ensuing bench trial were the product of an informed tactical choice. Counsel has absolute authority to bind the client. (See

26

*Masterson, supra*, 8 Cal.4th 965, 972-973.)  No due process interest is served by requiring counsel to expressly confirm any waiver of a jury trial in open court.

We further reject the contrary analysis in *Alvas, supra*, 221 Cal.App.3d 1459, 1464-1465, on which Barrett relies.  In *Alvas*, the Court of Appeal held that a due process violation occurs, and that a section 6500 commitment following a nonjury trial is invalid, when the record fails to show that the person being committed received an express advisement and personally waived the right to a jury trial.  *Alvas* emphasized the need for a knowing and intelligent waiver of that right.  In doing so, however, *Alvas* ignored the factors we deem most relevant — the individual's limited ability to personally make a jury trial decision, counsel's sole authority to do so, and the lack of any need for a jury trial advisement in this regard.  Insofar as *People v. Alvas, supra*, 221 Cal.App.3d 1459, is inconsistent with these conclusions, it is disapproved.

Finally, Barrett suggests that, at the very least, only the most profound cognitive impairments should prevent someone undergoing a section 6500 proceeding from being allowed to personally make the jury trial decision following a court advisement.  She seems to envision a cumbersome process in which the court holds (1) a pretrial evidentiary hearing on whether the person is so mentally retarded that counsel must handle all jury trial issues, and (2) a full-blown trial in which the fact finder (judge or jury) decides whether the person is so mentally retarded and dangerous as to warrant commitment.

However, when assessing competing due process concerns, courts are not blind to the " 'administrative burdens' " and "practical difficulties" of demanding new procedures.  (*Moore, supra*, 50 Cal.4th 802, 828, quoting *Allen, supra*, 44 Cal.4th 843, 867; see, e.g., *Tilbury, supra*, 54 Cal.3d 56, 69 [noting state's due process interest "in avoiding the cost of unnecessary jury trials" in hearings for 180-day outpatient placements for insanity acquittees under Pen. Code, § 1026.2].)

27

No statute guides the screening procedure suggested here, including the standards of mental retardation that might apply at each phase. To the extent significant overlap exists, we are reluctant to require duplicative hearings in the context of the compact timeframe in which one-year commitments, and recommitments, occur.

Considering all of the relevant factors, we reject Barrett's due process challenge to her nonjury trial. Nothing indicates that a valid waiver of her right to trial by jury did not occur.

## B. Equal Protection Claim

Barrett argues that federal and state equal protection principles require section 6500 proceedings to involve the same jury trial safeguards that apply under the LPS Act to proceedings in which already confined patients who pose a "demonstrated danger" as a result of "mental disorder or mental defect" may be retained for a further 180 days of intensive custodial treatment. (§ 5300, subds. (a)-(c); see § 5300 et seq. [postcertification procedures for imminently dangerous persons].) Specifically, under section 5302, the superior court must give an "advise[ment]" when the 180-day LPS Act proceeding begins that, among other things, the patient has a statutory "right to demand a jury trial" on the allegations of the petition. (*Ibid.*; see §§ 5301 [describing petition for postcertification treatment], 5303 [authorizing "requests [for] a jury trial" at the time of the hearing on such petitions].)[17] Barrett insists that persons who are allegedly mentally

---

**17** Section 5302 states: "At the time of filing a petition for postcertification treatment the court shall advise the person named in the petition of his right to be represented by an attorney and of his right to demand a jury trial. The court shall assist him in finding an attorney, or, if need be, appoint an attorney if the person is unable to obtain counsel. The court shall appoint the public defender or other attorney to represent the person named in the petition if the person is financially unable to provide his own attorney. The attorney shall advise the person of his rights in relation to the proceeding and shall represent him before the court."

retarded and dangerous under section 6500 are no different for jury trial purposes from 180-day LPS Act candidates under section 5300 et seq.  Relying heavily on the equal protection analysis set forth in *Alvas, supra*, 221 Cal.App.3d 1459, 1463-1464, and followed by the same court in *Bailie, supra*, 144 Cal.App.4th 841, 844-847, Barrett claims no rational distinction exists between the two groups as to involuntary commitment, and no compelling reason for their disparate statutory treatment on jury trial advisements.

Because of the fundamental interests at stake, equal protection principles are often invoked in civil commitment cases to ensure that the statutory scheme applicable to a particular class of persons has not treated them unfairly in comparison with other groups with similar characteristics.  (*People v. McKee* (2010) 47 Cal.4th 1172, 1199, and cases cited.)  A prerequisite to a meritorious claim is that individuals "similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Gary W., supra*, 5 Cal.3d 296, 303; accord, *In re Lemanuel C*. (2007) 41 Cal.4th 33, 47; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.)  Where two or more groups are properly distinguishable for purposes of the challenged law, it is immaterial if they are indistinguishable in other respects.  (*Cooley, supra*, at p. 253.)  Nor, absent this threshold requirement, is an equal protection inquiry into the justification for any legislative distinction necessary.  (See *Gary W.*, at pp. 304, 306.)

Barrett offers no analysis of the language, history, or function of section 5302 to facilitate the requisite constitutional comparison with jury trial procedures in section 6500 cases.  She simply seems to assume for equal protection purposes — consistent with her views in the due process context — that the express advisement in section 5302 is intended to ensure that dangerously disordered patients facing 180-day LPS Act commitments make an informed personal choice about whether to exercise their right to request a jury trial under section 5303.

29

However, we need not decide the meaning or purpose of section 5302 to resolve whether equal protection requires a similar jury trial advisement in section 6500 proceedings. Nor must we address the circumstances under which a 180-day LPS Act candidate may, either acting alone or through counsel, properly waive a jury trial and submit to a court trial under section 5303. Assuming for argument's sake that Barrett's view of section 5302 is correct, and assuming further that dangerous mentally retarded persons and dangerous mentally disordered persons are similarly situated as to the existence of a basic jury trial right, nothing compels the conclusion that they are also similarly situated as to the ancillary purpose that an express jury trial advisement, and an express personal waiver, purportedly serve.

As the People suggest, the critical factor is the distinct "mentality" (§ 6507) covered by the two schemes. Section 6500 et seq. governs commitments of dangerous mentally retarded persons, while the LPS Act is a comprehensive scheme for the involuntary detention, evaluation, and treatment of "mentally ill" individuals. (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008 (*Susan T.*).) For purposes of the LPS Act, such a mentally ill person is anyone who, "as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled." (§ 5150; see *John L., supra*, 48 Cal.4th 131, 142.) Intervention occurs on a limited basis through successive statutory periods which are initially quite brief (§ 5150 [72 hours]), and which are "carefully calibrated" to increase over time. (*Ben C., supra*, 40 Cal.4th 529, 541; see, e.g., §§ 5250 [14 days], 5270.15 [30 days], 5300 [180 days].) The process culminates in a one-year conservatorship (§ 5361) for persons who are "gravely disabled" (§ 5350) as a result of their mental disorders. (See § 5008, subd. (h)(1) & (2) [defining " 'gravely disabled' "]; see *id.*, subd. (h)(3) [excluding "mentally retarded persons by reason of being mentally retarded alone"].)

30

The term "mental disorder" is not defined in any LPS Act provision. (*People v. Allen* (2007) 42 Cal.4th 91, 107, fn. 7.)  Courts applying the LPS Act and similar commitment schemes have sought to fill this gap.  Mental illness and related disorders are said to be conditions that may arise suddenly and, for the first time, in adulthood.  (*Heller, supra*, 509 U.S. 312, 322.)  The LPS Act process itself assumes that the need for treatment may be temporary, and that disabling mental disorders may be intermittent or short-lived.  (See *Susan T., supra*, 8 Cal.4th 1005, 1018 ["not every detention under section 5150 leads to a conservatorship proceeding"].)

In addition, because of the complexity of human behavior, and the lack of a long history in every case, mental illness and related disorders may be difficult to diagnose.  (*Heller, supra*, 509 U.S. 312, 322, citing *Addington, supra*, 441 U.S. 418, 430.)  Where present, however, " 'mental illness "often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . *many mentally ill persons retain the capacity to function in a competent manner*." ' " (*In re Qawi* (2004) 32 Cal.4th 1, 17, italics added [addressing circumstances in which mentally disordered offenders under Pen. Code, § 2960 et seq. have qualified rights similar to some LPS Act patients to refuse antipsychotic drugs].)

These characteristics suggest that the mental conditions that create eligibility for an extended 180-day LPS Act commitment, though they include imminent dangerousness, do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings. Hence, nothing compels the conclusion that such LPS Act patients will not benefit by the statutory right to a jury trial advisement set forth in section 5302.  By contrast, in the case of persons alleged to be mentally retarded and dangerous under section 6500, the commitment process itself raises substantial doubts about their cognitive and intellectual functioning sufficient to limit the personal and

procedural role they play. It follows that the two groups are not similarly situated as to the function that Barrett implies an advisement like section 5302 serves — comprehending and controlling the decision whether to request a jury trial. Thus, any disparate statutory treatment with respect to jury trial advisements does not deprive persons like Barrett of equal protection of the law.

The equal protection analysis included in both *People v. Alvas, supra*, 221 Cal.App.3d 1459, 1463-1464, and *People v. Bailie, supra*, 144 Cal.App.4th 841, 844-847, does not persuade us to reach different conclusions. In finding no valid basis for any disparate statutory treatment as to jury trial advisements, both cases simply *assumed* that section 6500 defendants are similarly situated with 180-day LPS Act candidates. This assumption is flawed and erroneous for reasons we have explained. Hence, both *Alvas* and *Bailie* are disapproved to the extent they conflict with the views we have expressed.

We also reject a further insinuation in Barrett's equal protection claim. She suggests that, in not expressly authorizing jury trials or requiring jury trial advisements in section 6500 proceedings, even though several other commitment schemes include such rights, the Legislature has arbitrarily decided that alleged mentally retarded persons are unsuited to such protection, and has unfairly subjected them to more burdensome procedures than persons facing commitment in almost any other circumstance. In essence, Barrett simply implies that if some such schemes include these provisions, then all must.

But an equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. (See *Hofferber, supra*, 28 Cal.3d 161, 172 [Legislature "may adopt more than one procedure for isolating, treating, and restraining dangerous persons"].) Nothing compels the state "to choose between attacking every aspect of a problem or not attacking the problem at all." (*People v. Jennings* (2000) 81 Cal.App.4th 1301,

32

1312-1313.) Far from having to "solve all related ills at once" (*People v. Cooper* (1996) 43 Cal.App.4th 815, 829), the Legislature has "broad discretion" to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination. (*People v. Ward* (2005) 36 Cal.4th 186, 217, citing *McLaughlin v. Florida* (1964) 379 U.S. 184, 191; *Warden v. State Bar of California* (1999) 21 Cal.4th 628, 649.)

Contrary to what Barrett implies, she has not been singled out for harsh and unfair treatment in this regard. Of the nine commitment procedures we have listed above, a majority (including § 6500 et seq.) either do not reference jury trial matters at all (such that a right to jury trial on request has been constitutionally implied),[18] or they say nothing about advisements or waivers of any jury trial right otherwise provided therein.[19] By the same token, variations in the other

---

[18] See section 4825, added by Statutes 1977, chapter 1252, section 550, page 4564, operative July 1, 1978; see also *Hop, supra*, 29 Cal.3d 82, 92-94.

[19] For example, in proceedings to commit narcotic addicts, whether they have been convicted of crimes (see § 3050 et seq.) or not convicted of crimes (see § 3100 et seq.), section 3108 contemplates a "written demand" to be "tried by a jury" under civil law, and a verdict "by at least three-fourths of the jury." (§ 3108, as amended by Stats. 1967, ch. 1124, § 13, p. 2970); but see *People v. Thomas* (1977) 19 Cal.3d 630, 641, 644 [holding that due process requires proof beyond a reasonable doubt and unanimous verdicts in § 3108 jury trials].) Another approach to the basic jury trial right is used to civilly commit sexually violent predators. (See § 6600 et seq.) Since that scheme's enactment in 1995, section 6603 has stated that the defendant is "entitled to a trial by jury" (§ 6603, subd. (a)), and that the "attorney petitioning for commitment" also has "the right to demand that the trial be before a jury." (*Id*., subd. (b); see *id*., subd. (e) [if neither party demands a jury trial, "the trial shall be before the court without a jury"].) Elsewhere, in proceedings to determine the mental competence of criminal defendants, Penal Code section 1369 simply authorizes a "trial by court or jury," and regulates the content and chronology of such trials. (See Pen. Code, former § 1369, as amended by Stats. 1974, ch. 1511, § 5, p. 3318, eff. Sept. 27, 1974.)

commitment schemes suggest no uniform set of jury trial procedures exists or was withheld from Barrett.[20]  There is nothing unusual or unconstitutional about the manner in which these statutes have evolved over time.

---

**20**    See sections 1801.5 (contemplating jury trials in proceedings under § 1800 et seq. to detain disordered and dangerous persons upon discharge from the juvenile system, unless the right to jury trial is personally waived by the person, after being fully advised of the waived rights, and by the prosecuting attorney), 5302 (requiring that in LPS Act proceedings to extend custodial treatment to 180 days for imminently dangerous and disordered persons, the court must advise the person of the right to demand a jury trial); Penal Code, section 1026.5, subdivision (b)(3), (4) (providing that in proceedings to extend commitment and treatment of disordered and dangerous persons found not guilty by reason of insanity in felony cases, the court must advise the person of the right to jury trial, and that any waiver must be by both the person and the prosecuting attorney), Penal Code, section 2972, subdivisions (a) and (e) (establishing that in proceedings to continue commitment and treatment of mentally disordered and dangerous prisoners, the court must advise the person of the right to jury trial, and that any waiver must be by both the person and the district attorney).

For all of the foregoing reasons, Barrett has not presented a meritorious equal protection challenge to the statutory jury trial procedures available under section 6500 compared to other commitment schemes.  We decline to invalidate the commitment order entered after her nonjury trial on this ground.**21**

---

**21**     In separate concurring and dissenting opinions, Justices Liu and Werdegar likewise approve the commitment order, but only after crafting their own constitutional theory of equal protection — a theory which contravenes settled law and undercuts the Legislature's decision not to require jury trial advisements in section 6500 proceedings.  Justices Liu and Werdegar are aware that we have correctly applied the United States Supreme Court's prevailing "rational basis" standard for analyzing the equal protection claims of mentally retarded persons.  (*Heller, supra*, 509 U.S. 312, 319-321.)  Nonetheless, though Justice Liu argues otherwise, he and Justice Werdegar use the jury trial advisement *statutorily* available to certain mentally ill patients facing extended 180-day commitments under the LPS Act (see § 5302) to create a new *state constitutional* jury trial advisement right for mentally retarded persons.  Their reason for invoking the state charter is to import federal authority that is outmoded in this context (*Cleburne v. Cleburne Living Center, Inc*. (1985) 473 U.S. 432), and to thereby find an equal protection violation under an unduly strict standard of scrutiny.  (See *id*. at pp. 448, 450.)  The standard they propose was, of course, superseded, and essentially discarded, in *Heller, supra*, 509 U.S. at page 321.  Ironically, the views set forth at length in the concurring and dissenting opinions result in little real-world benefit to Barrett, and, as Justice Liu appears to concede, the right to a jury trial advisement for which he and Justice Werdegar advocate is largely symbolic.  Their analyses include the concession, either express or implicit, that Barrett was not necessarily entitled to *act* on such a direct advisement by personally deciding whether to demand a jury.  Moreover, they conclude that to the extent Barrett received no such advisement**,** no prejudice occurred in light of undisputed evidence that she was both mentally retarded and dangerous.  In sum, we find the concurring and dissenting opinions unpersuasive, and we decline to adopt their views or to modify our approach.

## IV.  DISPOSITION

The judgment of the Court of Appeal is affirmed.  To the extent the analyses in *People v. Alvas* (1990) 221 Cal.App.3d 1459, and *People v. Bailie* (2006) 44 Cal.App.4th 841, are inconsistent with the views expressed herein, these decisions are disapproved.

**BAXTER, J.**


**WE CONCUR:**

CANTIL-SAKAUYE, C. J.
KENNARD, J.
CHIN, J.
CORRIGAN, J.

36

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**

I agree with the majority's conclusion that defendant Christine Barrett was entitled to have a jury decide whether the state had proven she met the statutory standards for involuntary commitment under Welfare and Institutions Code section 6500.[1] (Maj. opn., *ante*, at p. 14.) But the majority's next step in its analysis is unpersuasive: it finds that although *mentally ill* persons facing involuntary civil commitment under the Lanterman-Petris-Short Act (§ 5000 et seq.) are entitled by statute to have the court advise them "of [their] right to demand a jury trial" (§ 5302), persons—like Barrett—who are alleged to be *mentally retarded* and a danger to themselves or others who similarly face involuntary civil commitment are not entitled to the same jury advisement. As Justice Liu explains in his separate opinion, the differences between mentally ill persons and those alleged to be mentally retarded "do not support a categorical distinction between the two groups with respect to a jury right advisement." (Conc. & dis. opn. of Liu, J., *post*, at p. 21.)

Article I, section 24 of the California Constitution provides that "[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." The California Constitution is thus a document of independent force, and the people of this state are not dependent on the United

---

[1]     All statutory references are to this code.

1

States Constitution as the primary source of their protection.  (See, e.g., *People v. Monge* (1997) 16 Cal.4th 826, 847, 871 (dis. opn. of Werdegar, J.) ["good reasons exist to rely on our state Constitution even before we consider whether the federal Constitution applies"].)  I thus agree with the approach taken by my colleague Justice Liu, in his separate opinion, relying on the state equal protection guarantee in article I, section 7 of the California Constitution, which provides that "[a] person may not be . . . denied equal protection of the laws . . . ."  As he explains (conc. & dis. opn. of Liu, J., *post*, at p. 44), this court's landmark decision in *Serrano v. Priest* (1976) 18 Cal.3d 728 made clear that our state equal protection clause is "possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable."  (*Id.* at p. 764.)

A critical first step when determining whether Barrett has a state equal protection right to an advisement of her jury trial right is to discern the appropriate equal protection standard, or level of scrutiny, applicable in the case.  We recently explained in *Hernandez v. City of Hanford* (2007) 41 Cal.4th 279, 298-299, that the first level of scrutiny " ' "is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a 'discrimination' or differentiation of treatment between classes or individuals. . . ." ' [Citation.]  This first basic equal protection standard generally is referred to as the 'rational relationship' or 'rational basis' standard."  But while the rational basis test under the Fourteenth Amendment to the United States Constitution has been applied to economic and social welfare legislation (see *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307 [applying the rational basis test to uphold a portion of the Cable Communications Policy Act of 1984]; *Warden v. State Bar* (1999) 21 Cal.4th 628 [applying the rational basis test to reject a challenge to exemptions from minimum continuing legal education for retired judges, state officers and

2

elected officials]), that highly deferential test is inappropriate here, where Barrett faces involuntary civil commitment under section 6500. This serious curtailment of her personal liberty, along with the stigma that attaches upon being found both mentally retarded and dangerous,[2] justifies a heightened standard in these circumstances, and for the reasons he explains, I agree with Justice Liu that the state constitutional protection of article I, section 7, in this context, should be informed by the high court's decision in *Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432. (See conc. & dis. opn. of Liu, J., *post*, at pp. 34-35; see generally *id.*, pt. V.)

The majority justifies its decision to distinguish between persons who are mentally ill and those who are mentally retarded in part by suggesting that because Barrett is alleged to be unable to care for herself, we should assume her attorney will act in her best interests (maj. opn., *ante*, at pp. 21-23); that due to Barrett's alleged mental deficits she would necessarily play a limited role in her defense (*id.* at p. 24); and that a personal jury advisement requirement "would have little effect on enhancing either the jury trial right itself or the vital interests it protects" (*ibid.*). Such reasoning fails to acknowledge that those suffering from mental retardation exhibit a wide range of abilities: "they range from those whose disability is not immediately evident to those who must be constantly cared for." (*Cleburne v. Cleburne Living Center, Inc.*, *supra*, 473 U.S. at p. 442.) More

---

**2** See, e.g., *U.S. v. Davis* (D.Md. 2009) 611 F.Supp.2d 472, 483 (parents resist having their children labeled mentally retarded "because of the stigma associated with it"); *State v. Vela* (2010) 279 Neb. 94, 129 [777 N.W.2d 266, 293] ("We are aware that a social stigma exists with respect to the phrase 'mental retardation.' "); *In re Daniel D.* (R.I. 2010) 9 A.3d 651, 652, fn. 1 (noting "the State of Rhode Island recently has endeavored to eliminate use of the word 'retarded' and like terms in an effort to address the unfortunate stigma attached to developmental disabilities").

3

importantly, the majority's reasoning fails to accord sufficient respect to the rights of the mentally disabled, as directed by our Legislature as a matter of state policy in section 4502, which states: "Persons with developmental disabilities have the same legal rights and responsibilities guaranteed all other individuals by the United States Constitution and laws and the Constitution and laws of the State of California." The same section provides: "It is the intent of the Legislature that persons with developmental disabilities shall have rights including, but not limited to, the following: [¶] . . . [¶] (j) A right to make choices in their own lives, including, but not limited to, where and with whom they live, their relationships with people in their community, the way they spend their time, including education, employment, and leisure, the pursuit of their personal future, and program planning and implementation." (*Ibid.*)

Accordingly, a legal scheme in which Barrett may be forced to live in an institution, against her will and possibly for the rest of her life, without being told she could have had a jury decide her fate, when the state requires a jury advisement for mentally ill persons facing essentially the same type of commitment (§ 5302), lacks a rational basis and thus violates Barrett's right to equal protection under the California Constitution.

Unlike the United States Constitution, the California Constitution specifies the conditions that must be present before a judgment is reversed. Article VI, section 13 of the California Constitution states: "No judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Like Justice Liu, I conclude that the violation of Barrett's rights under the state equal protection clause was harmless because it was not reasonably probable she would have achieved a more favorable result had the trial court

4

informed her of her jury trial right.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)[3]  Although I disagree with the majority's reasoning, I thus concur in its result.

**WERDEGAR, J.**

---

[3]    The majority criticizes the reasoning of the separate opinions, saying it is "[i]ronic[]," "largely symbolic," and "result[s] in little real-world benefit to Barrett."  (Maj. opn., ante, at p. 35, fn. 21.)  To the contrary, although Barrett has not demonstrated prejudice resulting from the trial court's failure to advise her of her jury trial right in the commitment hearing at issue here, she may be able to do so in the future if she is recommitted and the error recurs.  Moreover, were the majority to endorse, as I do, the state equal protection analysis set forth in Justice Liu's separate opinion, potential committees in the future would benefit from the jury trial advisement, thereby fulfilling the statutory directive that such persons have the "right to make choices in their own lives, including, but not limited to, where and with whom they live."  (§ 4502, subd. (j).)

5

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

To most people who are thrust into a courtroom, the whir and din of the legal process make for a bewildering experience. Counsel is necessary, but even diligent representation does not always ensure due regard for the dignity of a vulnerable yet dangerous individual whose liberty is at stake.

In this case, a young woman, Christine Barrett, was found mentally retarded and dangerous by a judge, and she was ordered committed to a secure treatment facility. Barrett was not charged with any crime, and the record does not show any criminal history. The order of commitment was for one year, but it is renewable year after year without limit. In all likelihood, the commitment proceeding has irreversibly altered the course of her life. And yet, there is no indication in the record of the proceedings that the trial court spoke directly to Barrett about her rights or any other substantive matter.

The trial court found that Barrett, in addition to having mental retardation, also suffered from mental illness. If Barrett had faced prolonged involuntary commitment on the basis of mental illness instead of mental retardation, she would have been statutorily entitled to an advisement by the court of her right to be tried by a jury. Barrett contends that the Legislature's selectivity — requiring the advisement for mentally ill persons but denying it to persons alleged to be mentally retarded — proceeds from the objectionable premise that persons in her position are unworthy of an advisement. As stated in her opening brief, she brings

1

an equal protection challenge to this disparate treatment on the ground that "there is no justification for depriving *all* people identified with having an intellectual or developmental disability from the opportunity to learn of the right to a jury trial, and to act on the information in accordance with their individual abilities."

I agree with Barrett. Although due process principles do not require involuntary commitment procedures to include a jury trial advisement either for persons who are mentally ill or for persons alleged to be mentally retarded, the statutory requirement of an advisement for one but not the other is unsupported by any facts or findings in the record before us. It is supported only by hypothesized differences concerning the relative abilities of the two groups to understand an advisement. To be sure, many potential committees who are alleged to be mentally retarded have disabilities that preclude any meaningful comprehension of a jury trial advisement. But that is not true of all such persons. Applying our state equal protection guarantee (Cal. Const., art. I, § 7, subd. (a)) as informed by federal constitutional precedent (*Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432 (*Cleburne*)), I conclude that there is no rational basis for denying Barrett — simply because she was alleged to be mentally retarded — the same advisement and the same dignity afforded by such an advisement to which other persons with mental disabilities are statutorily entitled when facing prolonged involuntary commitment.

Accordingly, I respectfully dissent from the court's denial of Barrett's equal protection claim. The court says I would "create a new *state constitutional* jury trial advisement right for mentally retarded persons." (Maj. opn., *ante*, at p. 35, fn. 21.) To be clear, my view is not that persons with mental retardation have a free-standing constitutional right to an advisement. As explained below, my view is that persons with mental retardation are, on the record before us, constitutionally entitled to the same *statutory* advisement right that the Legislature

2

has seen fit to provide to other persons with mental disabilities. But because I agree with the Court of Appeal that any failure to advise was harmless under the circumstances here, I concur in the court's affirmance of the judgment below.

## I.

Christine Barrett was 27 years old and living in a private residence under the care of the San Andreas Regional Center (Regional Center) when the district attorney filed a petition under Welfare and Institutions Code section 6500 to commit her as a person who is "mentally retarded" and "a danger to herself and others." (All undesignated statutory references are to the Welfare and Institutions Code.) The petition was filed at the request of Betty Crane, the Regional Center's service coordinator. The district attorney requested an evidentiary hearing and an order that Barrett be committed to the custody of the Department of Developmental Services (Department) for up to one year. The petition incorporated by reference a declaration from Crane along with "the assessment, evaluations, reports, and other documents" of the Regional Center. These were filed with the superior court, and we are treating them as confidential exhibits at the request of the parties. The reports attached to the petition are the only expert reports that appear in the record before us; no further reports were submitted by the parties or obtained by the court pursuant to its authority under section 6504.5 to order a report by the director of the regional center or the director's designee.

The petition was filed on January 22, 2009. On that date, the court set a hearing for March 9, 2009, and placed Barrett under the Department's care pending resolution of the petition. Counsel for both parties appeared on March 9, and the matter was continued to April 8 for an evidentiary hearing. The only record of that hearing is a printed minute order with no substantive information. It

is not clear whether Barrett was present or received any information at that time about the proceeding or her rights therein.

The proceedings resumed on April 8, 2009, in the presence of Barrett and counsel for both parties. The district attorney's sole witness was Dr. Robert Thomas, a psychologist for the Regional Center. Dr. Thomas testified that Barrett had been previously diagnosed with mental retardation and that she fell within the moderate range of mental retardation with an estimated IQ "[i]n the 50's to 40's." Although he did not conduct a formal cognitive assessment of Barrett, Dr. Thomas based his opinion of Barrett's mental retardation on her case file, which included school documents, psychological assessments, and medical documents with results of cognitive tests. He also based his opinion on the fact that Barrett, though initially deemed ineligible for Regional Center services, was accepted for such services in 2001 upon a second review of her case. Dr. Thomas said he personally evaluated Barrett once, during a visit to her apartment, and said he found it "very difficult to have a normal reciprocal conversation with her."

Dr. Thomas further testified that Barrett had also been diagnosed with a range of psychiatric conditions, including schizophrenia, bipolar disorder, and schizoaffective disorder. He said that individuals like Barrett with a dual diagnosis of mental illness and mental retardation do not always receive the treatment and supervision they need at the Regional Center because the staff there is trained to address mental retardation, not to provide psychiatric treatment.

In addition, Dr. Thomas testified that Barrett was a danger to herself and others based on his review of 20 to 30 incident reports dating back to 2001. He said those reports included numerous accounts of violent behavior, including physical assaults on Regional Center staff, destruction of property, and self-mutilation. Dr. Thomas also said that "[s]he has threatened suicide and verbalized suicidal thoughts" based on one of the incident reports. Although Dr. Thomas

4

could not describe the severity of each incident based on the reports, he testified that Barrett had the potential to cause serious injury to herself and to others because of her inability to control her aggression.

When asked whether Barrett's mental illness or her mental retardation was the cause of her dangerous behavior, Dr. Thomas said her mental retardation limited her ability "to understand the complexity of her disorder and the need for treatment." But he also said that given the extent of Barrett's mental and developmental disorders, "it would be very difficult to differentiate what behavior is attributed to what particular disorder." Dr. Thomas opined that the least restrictive placement for Barrett was commitment to the secure treatment facility where she had been placed pending disposition of the section 6500 petition.

Barrett testified on her own behalf. She spoke about her current placement, stating a clear preference for placement in a group home rather than the secure facility. She testified that she was taking medication that left her mind "clearer" and helped her to stay calm. The record contains no indication that her attorney or the court inquired into her ability to comprehend the proceedings or the rights to which she was entitled. But Barrett made clear that she wanted to make her own living and medical decisions: "[I]f I had a choice in life I'd have a choice to have my freedom and I'd have a choice to talk to my doctor."

Based on the testimony and reports, the trial court found that Barrett was mentally retarded and dangerous under section 6500, and committed her to the custody of the Department for one year. The court acknowledged that "Ms. Barrett presents a complex situation" in light of "a series of mental health diagnoses, many of which seem to be overlapping depending on various times." The court concluded that her dangerousness is "based upon mental retardation" and "may also have an element of being based on her mental illness."

5

The record does not show that the court directly addressed Barrett at any point in the proceedings to explain any rights she might have under state or federal law, including the right to trial by jury. Among other things, Barrett contends that the court's failure to advise her of the right to demand a jury trial violates the principle of equal protection of the laws.

**II.**

California has a panoply of statutes providing for the involuntary commitment of individuals who pose a threat to themselves and others. As we recently observed, "[d]ecisions by this court and the United States Supreme Court . . . have used the equal protection clause to police civil commitment statutes to ensure that a particular group of civil committees is not unfairly or arbitrarily subjected to greater burdens." (*People v. McKee* (2010) 47 Cal.4th 1172, 1199 [collecting cases].)

Most of California's civil commitment statutes apply to persons who have been accused or convicted of a crime. (See §§ 1800 et seq. [mentally disordered offenders discharged by juvenile authorities], 3000 et seq. [narcotics addicts], 6600 et seq. [sexually violent predators]; Pen. Code, §§ 1026–1027 [defendants acquitted by reason of insanity]; Pen. Code, § 1367 [defendants found mentally incompetent]; Pen., Code § 2960 et seq. [mentally disordered offenders].) Only two involuntary commitment schemes — the Lanterman-Petris-Short Act (LPS Act) (§ 5300 et seq.) and section 6500 — authorize the state to assert prolonged custody over individuals through proceedings completely separate from the juvenile and criminal justice systems. Section 5300 authorizes the commitment of certain mentally ill persons for 180 days upon a finding of dangerousness. Section 6500 authorizes a renewable one-year commitment for persons found to be mentally retarded and dangerous. Neither statute requires the state to show or charge criminal conduct.

6

In framing her equal protection claim, Barrett contrasts the procedures for a 180-day commitment under the LPS Act with the procedures for a one-year commitment under section 6500. The LPS Act expressly recognizes a right to a jury trial (§§ 5302, 5303) and says "the court shall advise the person named in the petition . . . of his right to demand a jury trial" (§ 5302). Section 6500, by contrast, does not mention the right to a jury trial or contain any advisement requirement.

Today's opinion confirms that an individual facing commitment under section 6500 has the right to trial by jury. (Maj. opn., *ante*, at pp. 14–15.) The court endorses "a long and unbroken line of California appellate court cases holding or assuming — largely on the basis of federal and state equal protection principles affecting fundamental interests — that persons alleged to be mentally retarded and dangerous cannot be denied a jury trial *altogether* where jury trials are granted by statute to persons alleged to be mentally impaired and dangerous under comparable commitment laws." (*Id.* at p. 14.) I join this holding of the court.

The question here is whether persons facing commitment under section 6500 are also entitled, as a matter of equal protection, to the same advisement of the right to trial by jury that is guaranteed to persons facing commitment under section 5300. It is on this question that I disagree with the court's opinion.

Barrett additionally contends that section 5302's advisement requirement means that the decision to waive a jury trial must be made personally by the individual facing commitment under the LPS Act and that this right to personal waiver extends to section 6500 proceedings as a matter of equal protection. The court does not decide whether a right to personal waiver inheres in section 5302 (maj. opn., *ante*, at p. 30), and I also see no need to decide that issue. Separate and apart from a right to personal waiver, a jury trial advisement has important value

7

to an individual facing involuntary commitment in at least two ways. First, an advisement may prompt the individual to discuss jury trial concerns with counsel if she is able. Even if counsel can be expected to consult with the client about such concerns when counsel believes it is "necessary or advisable" (maj. opn., *ante*, at p. 26), an advisement by the court may have the practical effect of empowering the individual, at her own initiative, to participate in the decision with counsel. Second, an advisement conveys respect for the individual's understanding of and interest in a key issue — who will be the decision maker, judge or jury? — in a proceeding that may inalterably shape the trajectory of her life. In short, an advisement recognizes the dignity and agency of the individual who appears before the court.

In addressing Barrett's equal protection claim, I begin in part III below by discussing at some length the troubled history of our nation's and our state's treatment of persons with mental disabilities. In part IV, I discuss the shortcomings of the court's analysis of Barrett's claim. In part V, I elucidate the proper standard of equal protection review and apply it to the statutory classification at issue here.

As my analysis will make clear, the issue in this case is not whether people who are mentally retarded generally have less cognitive ability than people who are mentally ill. Barrett's claim specifically concerns *the ability to understand a jury trial advisement* and involves a specific comparison between two groups: mentally ill persons facing 180-day commitment under section 5300 and persons alleged to be mentally retarded under section 6500. In light of historic and continuing misperceptions concerning the ability of persons who are mentally retarded to understand and influence their own fate, I believe the requirement of a jury trial advisement for persons facing commitment under section 5300, but not

for persons facing commitment under section 6500, does not survive equal protection scrutiny.

## III.

To fully appreciate the nature of a section 6500 proceeding and the context of Barrett's claim, it is helpful to begin with some history.  Civil proceedings against individuals alleged to be mentally retarded and dangerous have long been thought necessary to protect society as well as the individual involved.  But such proceedings also have a regrettably long history of abuse.

## A.

This history is familiar to those trained in the law.  For it was Justice Holmes's infamous opinion for the high court in *Buck v. Bell* (1927) 274 U.S. 200 that upheld a Virginia statute authorizing the compulsory "sterilization of mental defectives." (*Id.* at p. 205.)  That category included Carrie Buck, whom the court described as "a feeble-minded white woman" who was "the daughter of a feeble-minded mother" and "the mother of an illegitimate feeble-minded child." (*Ibid.*)  Echoing the eugenics theories popular at the time, Justice Holmes reasoned:  "We have seen more than once that the public welfare may call upon the best citizens for their lives.  It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence.  It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind.  The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. [Citation.]  Three generations of imbeciles are enough." (*Id.* at p. 207.)  With the high court's endorsement, Virginia officials forcibly sterilized Buck along with 8,300 other inmates of state mental institutions between 1927 and 1974, when the

9

law was finally repealed. (See Lombardo, Three Generations, No Imbeciles: Eugenics, the Supreme Court, and *Buck v. Bell* (2008) p. 294 (Lombardo).)

The high court's eight-to-one decision in *Buck v. Bell* reflected then prevalent attitudes toward persons with mental disabilities. Twenty-five states, including Virginia, had sterilization laws in place at the time *Buck v. Bell* was decided, and seven others followed suit by 1937. (Lombardo, *supra*, at p. 294; see *ibid.* [citing a 1965 study finding that more than 65,000 Americans were sterilized under such laws].) It is tempting to say, from our contemporary perspective, that such laws were the product of unthinking prejudice and blatant disregard for the rights of the individuals affected. But to their proponents, the sterilization laws had a genuinely benign purpose as an alternative to civil confinement. As the Virginia Supreme Court explained in Buck's case: "Unless sterilized by surgical operation, she must be kept in the custodial care of the [State Colony for Epileptics and Feeble-Minded] for thirty years, until she is sterilized by nature, during which time she will be a charge upon the State. If sterilized under the law, she could be given her liberty and secure a good home, under supervision, without injury to society. Her welfare and that of society would be promoted by such sterilization." (*Buck v. Bell* (Va. 1925) 130 S.E. 516, 517–518, affd. (1927) 274 U.S. 200.)

Moreover, the Virginia statute was not devoid of procedural safeguards. (See *Buck v. Bell*, *supra*, 274 U.S. at p. 206 [noting "the very careful provisions by which the act protects the patients from possible abuse"].) The high court described the statute's protections as follows: "The superintendent [of the State Colony for Epileptics and Feeble-Minded] first presents a petition to the special board of directors of his hospital or colony, stating the facts and the grounds for his opinion, verified by affidavit. Notice of the petition and of the time and place of the hearing in the institution is to be served upon the inmate, and also upon his

10

guardian, and if there is no guardian the superintendent is to apply to the Circuit Court of the County to appoint one. If the inmate is a minor notice also is to be given to his parents, if any, with a copy of the petition. The board is to see to it that the inmate may attend the hearings if desired by him or his guardian. The evidence is all to be reduced to writing, and after the board has made its order for or against the operation, the superintendent, or the inmate, or his guardian, may appeal to the Circuit Court of the County. The Circuit Court may consider the record of the board and the evidence before it and such other admissible evidence as may be offered, and may affirm, revise, or reverse the order of the board and enter such order as it deems just. Finally any party may apply to the Supreme Court of Appeals, which, if it grants the appeal, is to hear the case upon the record of the trial in the Circuit Court and may enter such order as it thinks the Circuit Court should have entered." (*Id.* at pp. 206–207.)

Although the statute did not include a right to counsel, the protections it did afford led the high court to conclude that "[t]here can be no doubt that so far as procedure is concerned the rights of the patient are most carefully considered." (*Buck v. Bell*, *supra*, 274 U.S. at p. 207.) And yet, careful scholars of Buck's life have come to the conclusion that neither she nor her daughter Vivian was "feeble-minded" at all. (See Lombardo, *supra*, at p. 139 [citing school records showing Buck "was a normal child"]; Brunius, Better for All the World: The Secret History of Forced Sterilization and America's Quest for Racial Purity (2006) pp. 76–77 [Vivian completed four semesters of school and made the honor roll before her death at age eight]; Smith & Nelson, The Sterilization of Carrie Buck (1989) p. 194 [reviewing letters written by Buck after her discharge from the Colony and concluding that "neither mother or daughter was illiterate despite Oliver Wendell Holmes' comments"].) Instead, it appears that Buck's real "deficiency" was that she was an unwed mother, likely as a result of rape, and this

11

was a point of embarrassment and shame for Buck's foster parents, who filed a petition supporting Buck's sterilization. (See Lombardo, *supra*, at pp. 139–140; Brunius, *supra*, at pp. 51–53; Smith & Nelson, *supra*, at p. 5.)

Although the doctrinal underpinnings of *Buck v. Bell* have been eroded (see *Skinner v. Oklahoma* (1942) 316 U.S. 535), the case remains a cautionary tale in two respects. First, although state intervention into the lives of individuals with mental disabilities has often been rationalized on the ground that it is for their own good or the good of society, unfounded assumptions of incapacity and a legacy of paternalism have resulted in serious "depriv[ations] of . . . basic liberty" with "subtle, far-reaching and devastating effects." (*Skinner*, at p. 541.) Second, even where such intervention is not inherently unlawful, laws directed at controlling individuals with mental disabilities have been prone to overbroad application despite what appear to be "very careful provisions . . . protect[ing] the patients from possible abuse" (*Buck v. Bell*, *supra*, 274 U.S. at p. 206).

## B.

California was not immune to the eugenics theories underlying the Virginia legislation at issue in *Buck v. Bell*. Indeed, by some accounts, California was a pioneer. During the first half of the 20th century, California's approach to persons who were mentally ill or developmentally disabled centered on institutionalizing such individuals or otherwise isolating them from the rest of society. A broad range of individuals deemed "feeble-minded" or mentally deficient were subject to sterilization. As treatments for mental illness advanced, California made efforts to differentiate mental conditions viewed as treatable from those viewed as hereditary or immutable. Over time, isolation and warehousing gradually gave way to treatment and habilitation. In the 1960s, the Legislature enacted substantive and procedural limits on the state's authority to commit individuals

12

with mental illness.  Protections for persons with mental retardation followed the same general trajectory but lagged behind those afforded to the mentally ill.

In 1909, California became the third state in the nation to pass a sterilization bill.  (Stats. 1909, ch. 720, § 1, pp. 1093–1094; see Stern, Eugenic Nation:  Faults and Frontiers of Better Breeding in Modern America (2005) p. 99.)  California's law was "perhaps the most expansive legislation of all state acts permitting sterilization."  (Lombardo, *supra*, at p. 26.)  It allowed "any inmate" of any state hospital, the California Home for the Care and Training of Feeble-Minded Children, or any state prison to be "asexualized" whenever a panel of medical officials determined "it would be beneficial and conducive to the benefit of the physical, mental or moral condition" of that individual.  (Stats. 1909, ch. 720, § 1, p. 1093.)  Although the law applied only to prisoners who had been imprisoned "at least two times for some sexual offense, or at least three times for any other crime" (*id.* at p. 1094), it placed no substantive limits on the sterilization of persons deemed "feeble-minded."

The 1909 act was repealed in 1913 and replaced with legislation applying to three discrete groups.  Before release or discharge, inmates of state hospitals for the insane "afflicted with hereditary insanity or incurable chronic mania or dementia" could be sterilized with or without their consent at the discretion of "the state commission in lunacy . . . after a careful investigation of all the circumstances of the case."  (Stats. 1913, ch. 363, § 1, pp. 775–776.)  Recidivists committed to state prison for sexual crimes could also sterilized whenever the resident physician determined it would be "to the benefit of the physical, mental or moral condition" of the inmate.  (*Id.*, § 2, p. 776.)  Finally, any "idiot or fool" could be sterilized by the superintendent of any state hospital with the written consent of a parent or appointed guardian.  (*Id.*, § 3, p. 776.)  Upon written request

13

of the parent or guardian, the operation was to be performed "without charge." (*Ibid.*)

The 1913 law was repealed four years later and replaced with two separate statutes. The first statute, enacted in May 1917, expanded the state's authority to sterilize inmates of mental hospitals before their release if they were found to be afflicted with hereditary mental disease, "the various grades of feeble mindedness," or "perversion or marked departures from normal mentality or . . . disease of a syphilitic nature." (Stats. 1917, ch. 489, § 1, p. 571.) The second statute, enacted in June 1917, established "an institution to be known as the Pacific colony" devoted to "the care, confinement and instruction of feeble-minded and epileptic persons." (Stats. 1917, ch. 776, § 1, p. 1623 & preamble.) The statute defined " 'feeble-minded' " to include persons who were "not insane" but "so mentally deficient that they are incapable of managing themselves and their affairs independently, with ordinary prudence, or of being taught to do so, and who require supervision, control, and care, for their own welfare, or for the welfare of others, or for the welfare of the community." (*Id.*, § 16, p. 1626.) The June 1917 statute marked the first effort by the Legislature to differentiate between persons classified as "insane" (mentally ill) and those classified as "feeble-minded" (mentally retarded) in the context of civil commitment.

The June 1917 statute created a procedure for involuntary commitment that later became section 6500. "[A]ny parent, guardian or other person charged with the support of a supposedly feeble-minded person" could petition the court for admission of the individual to the Pacific colony. (Stats. 1917, ch. 776, § 17, p. 1626.) The petitioner had to submit a verified affidavit "disclos[ing] his reasons for supposing such person to be eligible for admission." (*Ibid.*) Peace officers could also petition for commitment, but they were required to provide written

14

notice of the petition to the "parent, guardian or other person charged with such support" of the proposed committee, if known. (*Ibid.*)

If a person was found to be "feeble-minded," the judge could order the person committed indefinitely to the Pacific colony, so long as the person had been a resident of California for at least a year. (Stats. 1917, ch. 776, § 19, pp. 1626–1627.) The only provision for discharge or release was at the discretion of the institution's board of trustees. (*Id.*, § 41, p. 1631.) Before discharge, the board of trustees could order sterilization "with or without the consent of the inmate" upon a recommendation of the superintendent based on "careful investigation of all the circumstances." (*Id.*, § 42, p. 1631.) The statute declared that such sterilization "shall be lawful" and deemed the trustees and "any person participating in the operation" immune from civil or criminal liability. (*Ibid.*) In 1937, the Legislature added a provision requiring the court in a commitment proceeding to give "due notice of the hearing of the petition" to the "alleged incompetent." (Stats. 1937, ch. 369, pp. 1005, 1137.)

During the 1950s, improved medical treatments and increased public awareness of the "scandalous conditions in state mental institutions" gave rise to a deinstitutionalization movement. (Levy & Rubenstein, The Rights of People with Mental Disabilities (1996) p. 19 [citing Deutsch, The Shame of the States (1948)].) From midcentury through the 1970s, California took a series of important if halting steps that would, at one point, establish our state as a leader in protecting the civil rights of persons with mental disabilities. As explained below, reforms applicable to persons with mental illness focused on procedural rights that gave such individuals the opportunity to participate in and make decisions about their care to the extent possible. By contrast, reforms applicable to persons with mental retardation began with substantive limits on the state's authority to order

15

involuntary commitment.  Although procedural protections followed, they generally lagged behind the protections afforded to persons with mental illness.

The first step toward reform came in 1951, when California enacted a new sterilization scheme for all persons with mental disabilities under the jurisdiction of the Department of Mental Hygiene.  (Stats. 1951, ch. 552, § 1, pp. 1706–1707.)  For the first time, the Legislature required written notice to the patient and his or her guardians of any proposed sterilization and created a procedure for individuals to object and seek judicial review.  (*Ibid.*)  If the patient or a family member filed a written objection within 30 days, the department director was required to "make full inquiry into the case, and may hold a hearing."  (*Id.*, p. 1707.)  If the director decided that the patient should be sterilized despite the patient's or the family's objection, the director had to provide written notice of the decision and the right to petition the superior court for review.  Whether due to this law or to other factors, the use of sterilization in California dropped significantly.  After sterilizing over 19,000 individuals between 1909 and 1949, the state performed only 981 procedures between 1949 and 1959.  (Lombardo, *supra*, at pp. 241–242.)

In 1965, the commitment scheme for "feeble-minded" persons was recodified, and the term "feeble-minded" was replaced with "mentally deficient persons."  (Stats. 1965, ch. 391, § 4, pp. 1630, 1668 [former § 5590].)  Individuals who were adjudged "mentally deficient" and who had resided in the state for at least one year could be ordered committed to the Department of Mental Hygiene for placement in the Sonoma State Home or the Pacific colony.  (*Id.*, p. 1670.)  Individuals who had been in the state for less than one year could also be committed to the department "for the purpose of transportation of such person to the state of his legal residence."  (*Ibid.*)

In 1967, California enacted the LPS Act in order "[t]o end the inappropriate, indefinite, and involuntary commitment of mentally disordered

16

persons and persons impaired by chronic alcoholism, and to eliminate legal disabilities." (Stats. 1967, ch. 1667, § 36, pp. 4053, 4704 [former § 5001, subd. (a)].) The LPS Act created a tiered scheme for involuntary commitment of individuals with mental illness. Upon "reasonable cause," peace officers or other designated professionals could place an individual believed to be dangerous or gravely disabled into custody for 72-hour treatment and evaluation. (*Id.*, pp. 4077–4078 [former § 5150].) Staff at the facility could then certify the individual for an additional 14-day involuntary intensive treatment (*id.*, pp. 4085–4088 [former § 5250]), subject to judicial review (*id.*, pp. 4088–4089 [former § 5275 et seq.]). After 14 days, an individual could be committed for an additional 90 days only after a hearing to determine whether the individual presented "an imminent threat of substantial physical harm to others." (*Id.*, pp. 4089–4091 [former § 5300].) The statute required the court to appoint counsel to represent the person in that hearing, and the statute required counsel to advise the proposed committee of his or her rights. (*Id.*, p. 4090 [former § 5302].) Alternatively, an individual found to be "gravely disabled" could be committed through a one-year conservatorship. (*Id.*, pp. 4093–4098.) Before such commitment, the individual had a right to demand a jury trial. (*Id.*, p. 4094 [former § 5350, subd. (d)].)

Many of the LPS Act's procedures for commitment of mentally ill persons remain in place today (see *post*, at p. 21), although the 90-day commitment has been extended to 180 days (see § 5300 [current]). By all accounts, the LPS Act was a genuine step forward in protecting the rights of such individuals facing civil commitment. "The LPS Act has been called a 'Magna Carta for the Mentally Ill' that 'established the most progressive . . . commitment procedures in the country.' " (*In re Qawi* (2004) 32 Cal.4th 1, 17 [quoting Assem. Subcom. on Mental Health Services, Dilemma of Mental Commitments in California (1978) foreword by Assemblyman Louis Papan].)

In contrast to the commitment procedures for persons with mental illness, the LPS Act simply recodified the existing commitment scheme for "mentally deficient persons," moving the statute to section 6500 of the Welfare and Institutions Code and replacing the phrase "mentally deficient persons" with " 'mentally retarded persons.' " (Stats. 1967, ch. 1667, § 37, pp. 4107, 4134–4137.) Whereas the prior version of the statute applied to "[a]ny mentally deficient person," the statute now provided: "Any mentally retarded person requiring hospitalization may be committed to the Department of Mental Hygiene . . . ." (*Id.*, p. 4134 [former § 6501].) The LPS Act did not explain what conditions might "requir[e] hospitalization"; it simply provided that the court could order a hospitalization commitment simply upon a finding that the person was "mentally retarded." (*Id.*, p. 4136.) The LPS Act did not give individuals facing commitment under section 6500 a right to counsel.

As enacted in 1967, the LPS Act also recodified the sterilization procedures established in 1951, authorizing the sterilization of individuals with hereditary mental disease, mental retardation, and other "[m]arked departures from normal mentality." (Stats. 1967, ch. 1667, § 40, pp. 4146, 4155 [former § 7254].) The sterilization law was not repealed until 1979. (Stats. 1979, ch. 552, § 1, p. 1762.)

In 1970, the Legislature enacted section former 6500.1, establishing the first substantive limit on the state's authority to involuntarily commit individuals with developmental disabilities. The act provided: "On and after July 1, 1971, no mentally retarded person may be committed to the Department of Mental Hygiene pursuant to this article, unless he is a danger to himself or others." (Stats. 1970, ch. 351, § 3, p. 765.)

Even as the 1970 act imposed a requirement of dangerousness as a substantive limit on the involuntary commitment of persons with mental retardation, a second bill passed later that year established an additional

18

*procedural* protection for persons with mental illness. In addition to providing the right to counsel, the Legislature beginning in 1970 required trial courts to advise mentally ill persons facing prolonged commitment of their right to demand a jury trial. (Stats. 1970, ch. 1627, § 17, p. 3443.) This advisement requirement, now codified at section 5302, is the basis of Barrett's equal protection claim.

It was not until 1975 that the Legislature provided the right to counsel in section 6500 proceedings. (Stats. 1975, ch. 694, § 27, p. 1651.) The 1975 act also imposed a substantive time limit on commitment, providing that any order for commitment would automatically expire after one year. (*Ibid.*) Any party authorized to submit an original petition for commitment could file subsequent petitions for additional one-year periods of commitment, and each subsequent petition would follow the same procedures applicable to the original petition. (*Ibid.*) These provisions remain in place today. (See § 6500.)

Ten years after the LPS Act was passed, the Legislature in 1977 extended the LPS Act's goal of ending "inappropriate, indefinite, and involuntary commitment" to individuals with developmental disabilities, a term defined to include mental retardation. (Stats. 1977, ch. 1167, § 1, p. 3824 [former § 5001].) At the same time, the Legislature enacted the Lanterman Developmental Disabilities Services Act (Lanterman Act). (Stats. 1977, ch. 1252, § 550, p. 4521.) The Lanterman Act expanded community-based treatment and habilitation services for persons with a wide range of developmental disabilities, and it declared that "[p]ersons with developmental disabilities have the same legal rights and responsibilities guaranteed all other individuals," including "[a] right to dignity" (*id.*, pp. 4521–4522, p. 4712, codified at § 4502, subd. (b)) and, as provided by a 1992 amendment, a right "to make choices in their own lives" (Stats. 1992, ch. 1011, § 3, codified at § 4502, subd. (j)). However, the Lanterman

19

Act did not extend the LPS Act's full panoply of procedural and substantive protections to persons facing commitment under section 6500.

Since 1977, a number of amendments have been made to the section 6500 scheme. (See Stats. 1977, ch. 695, § 7, pp. 2248–2249 [providing a nonexclusive definition of "dangerousness" to include incompetence to stand trial for specific provisions of the Penal Code]; Stats. 1978, ch. 1319, § 1, p. 4316 [repealing definition of "mentally retarded"]; Stats. 1978, ch. 429, § 220, pp. 1462–1463 [amending list of Penal Code sections related to definition of "dangerousness"]; Stats. 1989, ch. 897, § 47, pp. 3079–3080 [same]; Stats. 1993, ch. 610, § 33, pp. 3433–3435 [same]; Stats. 1994, ch. 224, § 10, pp. 1791–1792 [same]; Stats. 1996, ch. 1075, § 20, pp. 7237–7238 [same]; Assem. Bill No. 1472, approved by Governor, June 27, 2012 (2011–2012 Reg. Sess.) [replacing the term "mental retardation" and similar terms with "developmental disability" and enacting substantive changes to the term of commitment].) But the basic procedures for involuntary commitment under section 6500 have remained unchanged since the mid-1970s. For the sake of consistency with today's majority opinion, I will cite and quote from the section 6500 scheme as it existed at the time of Barrett's commitment proceedings. (Maj. opn., *ante*, at pp. 1–2, fn. 2.)

### IV.

With this historical context, I now turn to Barrett's equal protection claim, beginning with an examination of today's opinion.

### A.

In rejecting Barrett's claim, the court says "the critical factor is the distinct 'mentality' (§ 6507) covered by the two schemes." (Maj. opn., *ante*, at p. 30.) The court observes that mental disorders "may arise suddenly and, for the first time, in adulthood"; that "[t]he LPS Act process itself assumes that the need for treatment may be temporary, and that disabling mental disorders may be

20

intermittent or short-lived"; and that " ' "mental illness 'often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently . . . *many mentally ill persons retain the capacity to function in a competent manner*.' " ' [Citation.]"  (*Id.* at p. 31.)  "These characteristics suggest that the mental conditions that create eligibility for an extended 180-day LPS Act commitment, though they include imminent dangerousness, do not necessarily imply incompetence or a reduced ability to understand, and make decisions about, the conduct of the proceedings.  Hence, nothing compels the conclusion that such LPS Act patients will not benefit by the statutory right to a jury trial advisement set forth in section 5302.  By contrast, in the case of persons alleged to be mentally retarded and dangerous under section 6500, the commitment process itself raises substantial doubts about their cognitive and intellectual functioning sufficient to limit the personal and procedural role they play.  It follows that the two groups are not similarly situated as to the function that Barrett implies an advisement like section 5302 serves — comprehending and controlling the decision whether to request a jury trial.  Thus, any disparate statutory treatment with respect to jury trial advisements does not deprive persons like Barrett of equal protection of the law."  (*Id.* at pp. 31–32.)

I do not disagree that there are real differences between persons facing commitment under section 5300 and persons facing commitment under section 6500.  But those differences, properly understood, do not support a categorical distinction between the two groups with respect to a jury right advisement.

As an initial matter, even if mental disorders are often temporary, intermittent, or treatable with medication, it is not the case that all persons subject to a 180-day commitment under the LPS Act are capable, at the time of the proceeding, of comprehending a section 5302 advisement.  Indeed, under the graduated scheme of increasingly lengthy commitment set forth by the LPS Act

21

(see §§ 5150 [initial 72-hour "treatment and evaluation"], 5250 [14-day commitment for "intensive treatment"], 5270.15 [30-day commitment for additional "intensive treatment"]), one can logically infer that many individuals facing a 180-day commitment under section 5302 have mental disorders that are *not* temporary, intermittent, or susceptible to effective treatment.  The most the court can say about "the mental conditions that create eligibility for an extended 180-day LPS Act commitment" is that they "do not *necessarily* imply incompetence or a reduced ability to understand . . . the conduct of the proceedings."  (Maj. opn., *ante*, at p. 31, italics added.)  The implication is that at least some (and probably many) potential committees under section 5300 will have mental conditions that preclude comprehension of the proceedings.  Those individuals "will not benefit by the statutory right to a jury trial advisement" (maj. opn., *ante*, at p. 31), but the trial court is required to give the advisement anyway. (§ 5302.)

Just as there are individuals facing commitment under section 5300 who cannot understand a jury right advisement, there are individuals facing commitment under section 6500 who can.  Why else would section 6500 say that "[i]n any proceedings conducted under the authority of this article, the alleged mentally retarded person shall be informed of his or her right to counsel by the court . . . "?  And why else would section 6504 say that "[i]n all cases the court shall require due notice of the hearing of the petition to be given to the alleged mentally retarded person"?  These provisions do not imply that all potential section 6500 committees can understand an advisement.  But they appear to be premised on the notion that a subset of potential committees can, for "[t]he law neither does nor requires idle acts."  (Civ. Code, § 3532.)  That is not to say that a jury trial advisement is required whenever a civil commitment statute requires notice of the right to counsel.  It is to say that the rationale for denying a jury trial

22

advisement in section 6500 proceedings cannot be that persons subject to such proceedings are categorically incapable of comprehending the advisement.

As the United States Supreme Court has observed, persons who are classified as mentally retarded comprise a "large and diversified group," ranging "from those whose disability is not immediately evident to those who must be constantly cared for." (*Cleburne*, *supra*, 473 U.S. at p. 442; see Wald, *Principal Paper* in The Mentally Retarded Citizen and the Law (The President's Committee on Mental Retardation, 1976) p. 5 ["Retarded people, like all people, vary enormously in talent, aptitude, personality, achievement, and temperament. . . . Each person's capacities must be judged individually before he can be denied rights of citizenship or humanity."].) "The American Association on Mental Deficiency (AAMD) has defined mental retardation as ' "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." ' " (*Cleburne*, *supra*, 473 U.S. at p. 443, fn. 9.) With respect to intellectual functioning, persons diagnosed as mentally retarded typically have an IQ of 70 to 75 or below. (Amer. Assn. on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Supports (10th ed. 2002) pp. 57–58 (AAMR).) But among such individuals, there are significant differences in cognitive abilities.

The AAMR guidelines specify four different degrees of mental retardation, from mild to profound. According to that classification system, an adult with an IQ between 50 and 70 is deemed to have "mild" mental retardation. (AAMR, *supra*, at p. 104; see also *Cleburne*, *supra*, 473 U.S. at p. 442, fn. 9.) A mildly mentally retarded person is "[l]ikely to [have] some learning difficulties in school," but "[m]any adults will be able to work and maintain good social relationships and contribute to society." (AAMR, at p. 104.) Mild mental retardation in adults is equivalent to a "mental age from 9 to under 12 years."

23

(*Ibid.*)  As to what such a "mental age" might mean, I note that California's history and social studies curriculum expects fifth-graders to be able to learn, among other things, "the significance of the new Constitution of 1787, including the struggles over its ratification and the reasons for the addition of the Bill of Rights."  (Cal. Department of Education, History-Social Science Framework for California Public Schools Kindergarten Through Grade Twelve (2005) p. 73.)  Many fifth-graders are no doubt capable of understanding the importance of trial by jury.

The vast majority of persons who are mentally retarded are classified as mildly retarded (see *Cleburne*, *supra*, 473 U.S. at p. 442, fn. 9), although it is unclear what proportion of individuals facing commitment under section 6500 are mildly retarded.  But it must be remembered that the class of individuals denied the right to advisement by section 6500 is not limited to individuals who are, in fact, mentally retarded.  Rather, it is comprised of persons *alleged* to be mentally retarded.  The statutory scheme does not presume that an individual subject to a section 6500 proceeding *is* mentally retarded.  Instead, it repeatedly refers to an "*alleged* mentally retarded person" (§§ 6500, 6504, 6504.5, 6505, 6506, 6507, italics added), and the section 6500 proceeding is designed to determine *whether* a person is mentally retarded and dangerous.  Assuming that some potential committees are found *not* to be mentally retarded, the range of cognitive abilities among persons subject to section 6500 proceedings is even broader than the range of such abilities among persons found to be mentally retarded.

In discussing Barrett's due process claim, the court cites several of our cases for the proposition that persons who are mentally impaired are unable to act in their own best interests and concludes that "[s]imilar logic applies here."  (Maj. opn., *ante*, at p. 23.)  But none of those cases supports the categorical denial of a jury trial advisement to persons alleged to be mentally retarded under section

24

6500. *People v. Masterson* (1994) 8 Cal.4th 965 addressed waiver, not advisement, of the jury trial right in the context of a criminal competence hearing, and unlike the process for initiating a section 6500 proceeding (see *post*, at pp. 26–28), there must be " 'substantial evidence' rais[ing] a ' "reasonable doubt" ' " as to the defendant's competence before a hearing is conducted on the issue. (Maj. opn., *ante*, at p. 22, fn. 16.) In *Thorn v. Superior Court* (1970) 1 Cal.3d 666, 674–675, we observed that a mentally ill person facing involuntary 14-day treatment under the LPS Act may lack the capacity to comprehend his statutory rights. Yet we made that observation not as a reason to dispense with statutorily required advisements (*Thorn*, at p. 674), but as a reason to establish additional "procedures . . . which will assure that the patient's rights receive meaningful protection" (*id.* at p. 675). Finally, it is true that *In re Hop* (1981) 29 Cal.3d 82, 90–91 recognized that a "developmentally disabled adult too incompetent to admit herself to a mental hospital was not competent to protest or consent to hospitalization by third parties under the [Lanterman Act]." (Maj. opn., *ante*, at p. 23.) But the court nevertheless held that such developmentally disabled individuals are, as a matter of equal protection, "entitled to the same congeries of rights" made available to "proposed conservatees under the Lanterman-Petris-Short Act." (*In re Hop*, at p. 93.)

**B.**

Today's opinion says that "*the commitment process itself* raises substantial doubts about [potential committees'] cognitive and intellectual functioning sufficient to limit the personal and procedural role they play." (Maj. opn., *ante*, at pp. 31-32, italics added; see *id.* at p. 3 ["The section 6500 procedure itself undermines Barrett's assumption that persons alleged to be mentally retarded and dangerous can necessarily decide for themselves, in a knowing and intelligent manner, whether to demand a jury at their commitment trials."].) According to the

25

court, the section 6500 process begins when "a responsible and interested party" requests the filing of a section 6500 petition. (Maj. opn., *ante*, at p. 25.) The requesting party presents "strong evidence" (*id.* at p. 3) and "specific information" (*id.* at p. 25), verified by affidavit, that the individual is mentally retarded. After the petition is filed, the trial court receives a "professional pretrial evaluation" of the individual and "informed recommendations on treatment and placement" from the regional center. (*Id.* at p. 25.) This account of the process leads the court to conclude that "someone like Barrett, who is alleged to be mentally retarded and dangerous under section 6500, is not in a position . . . to sufficiently comprehend the jury trial advisement . . . ." (*Id.* at pp. 25–26.)

According to the court, the process that sets in motion a section 6500 proceeding effectively identifies persons who are in fact, or should be presumed to be, not only mentally retarded but so much so that they cannot understand a jury trial advisement. But, as previously noted (*ante*, at p. 22), such a conclusion defies the essential premise underlying other advisements that a court must give in a section 6500 proceeding. Moreover, in describing the commitment process, the court applies its own gloss instead of focusing on what the statute actually says.

Section 6502 requires that a request for the filing of a section 6500 petition "shall state the petitioner's reasons for supposing the person to be eligible for [commitment], and shall be verified by affidavit" — nothing more. The statute contains no requirement that the reasons be "strong" (maj. opn., *ante*, at p. 3) or "specific" (*id.* at p. 25), nor does it otherwise specify what quantum of evidence is necessary to trigger the filing of a section 6500 petition. Further, the court describes the persons authorized to request a petition (a parent, guardian, conservator, probation officer, corrections official, or regional center director, among others) as "responsible and interested" parties. (Maj. opn., *ante*, at p. 25.) This may be true in most cases, but the statute plainly contemplates exceptions.

26

(See §§ 6510 ["In case of the dismissal of the petition, the court may, if it considers the petition to have been filed with malicious intent, order the petitioner to pay the expenses in connection therewith . . . ."], 6511 ["Any person who knowingly contrives to have any person adjudged to be mentally retarded under the provisions of this article, unlawfully or improperly, is guilty of a misdemeanor."].)  Even apart from circumstances as fraught as Carrie Buck's, it is not hard to imagine scenarios in which the physical, emotional, or financial costs of caring for a "difficult" adult child or ward may result in a section 6500 commitment proceeding that is neither necessary nor appropriate for that individual.  (See *Heller v. Doe* (1993) 509 U.S. 312, 347 (dis. opn. of Souter, J.) [parents, guardians, and close family members may have interests adverse to an allegedly retarded person facing commitment] (*Heller*).)  And even when the request and petition process does identify a person who is mentally retarded, it cannot be assumed that the person cannot comprehend a jury trial advisement. (*Ante*, at pp. 22-24.)

Furthermore, it is true that section 6504.5 requires the regional center to provide a professional evaluation and informed recommendations to aid the trial court.  But the regional center's report has no bearing whatsoever on who is made subject to a section 6500 petition.  That is because the trial court requests and receives the report *after* the petition has already been filed.  (§ 6504.5 ["Wherever a petition is filed pursuant to this article, the court shall appoint the director of a regional center . . . , or the designee of the director, to examine the alleged mentally retarded person.  [¶]  Within 15 judicial days after his or her appointment, the regional center director or designee shall submit to the court in writing a report . . . ."].)  The report does not help to establish *at the time the petition is filed* that the person alleged to be mentally retarded and dangerous is in

27

fact a person who is "not in a position . . . to sufficiently comprehend the jury trial advisement" (maj. opn., *ante*, at p. 26).

In addition, although regional centers undoubtedly provide valuable services to needy clients and helpful expertise to our trial courts, we have acknowledged that budgetary considerations place a "subtle strain . . . on the center's impartial neutrality and detachment." (*In re Hop*, *supra*, 29 Cal.3d at p. 92.) The court in *In re Hop* unanimously observed that regional centers face "subtle pressure favoring hospital treatment as opposed to community placement of the ward. Local community placement may be difficult to locate and also expensive, and its cost may be borne locally by a regional center's budget. Hospital placements are funded from statewide sources." (*Ibid.*) This concern provides an additional reason to reject the court's unqualified confidence that a person subject to a section 6500 proceeding is a person who is so cognitively impaired that he or she cannot understand a jury trial advisement.

In sum, the distinction between persons facing commitment under section 5300 and persons facing commitment under section 6500 is not a distinction between who can understand a jury trial advisement and who cannot. There are many individuals facing commitment under section 5300 who cannot understand such an advisement, and there are many individuals facing commitment under section 6500 who can. If there is a rational basis for requiring an advisement for one group but not the other, it cannot rest on a categorical description of the capabilities of one or both groups.

## V.

A different response to Barrett's equal protection claim is that the Legislature could have differentiated between section 5300 and section 6500 proceedings on the basis of *generalizations* rather than categorical claims about the two groups facing commitment. The Legislature could have assumed that

28

most potential section 5300 committees can understand a jury trial advisement, whereas most potential section 6500 committees cannot. Or the Legislature could have speculated that the share of individuals capable of understanding an advisement is simply greater among persons facing commitment under section 5300 than among persons facing commitment under section 6500. In essence, this is a rationale based on administrative burdens. Although not every person facing commitment under section 6500 is incapable of understanding an advisement, the Legislature could have assumed that the share of persons under section 6500 with that ability, compared to the share of such persons under section 5300, is not large enough to justify burdening the trial courts with giving an advisement in every case.

Further, the court posits an additional rationale for the legislative scheme: "Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' [Citation.] Far from having to 'solve all related ills at once' [citation], the Legislature has 'broad discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination. [Citations.]" (Maj. opn., *ante*, at pp. 32–33.) The argument is that the Legislature may proceed "one step at a time." (*Williamson v. Lee Optical Co.* (1955) 348 U.S. 483, 489 (*Lee Optical*).)

In considering the "administrative burden" and "one step at a time" rationales, I begin by observing that these two justifications for legislative classification are hallmarks of conventional rational basis review, a highly deferential standard of equal protection review paradigmatically applicable to social and economic legislation. (E.g., *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 314–320 [applying "regulatory-efficiency" rationale to uphold statutory definition of "cable system"] (*Beach Communications*); *Lee Optical*, *supra*, 348 U.S. at p. 489 [applying "one step at a time" rationale to

29

uphold statute that prohibited opticians, but not sellers of ready-to-wear glasses, from fitting or duplicating lenses without a prescription from an optometrist or ophthalmologist]; *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 374 [applying "administrative costs" rationale to uphold statute authorizing periodic payment procedure for some but not all medical malpractice victims] (*American Bank*).)  The "irrelevan[ce]" of "whether the conceived reason for the challenged distinction actually motivated the legislature" is also characteristic of conventional rational basis review.  (*Beach Communications*, at p. 315.)  The inquiry examines what the Legislature *could have* believed because the statutory classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  (*Id.* at p. 313.)  The Legislature need not actually articulate its rationale, and "a legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data."  (*Id.* at p. 315.)

If conventional rational basis review were applicable here, I would have no difficulty upholding the distinction between section 5300 and section 6500 proceedings in terms of jury trial advisement, because either the "administrative burden" or the "one step at a time" rationale is within the realm of rational legislative speculation.  The question, however, is whether conventional rational basis review is the appropriate standard here.  We are not dealing in this case with a legislative classification that distinguishes among cable operators, eye care specialists, or medical malpractice victims.  The statutory schemes at issue here draw a distinction between mentally disordered and allegedly mentally retarded persons subject to involuntary commitment, ensuring for one while denying to the other an advisement of the right to trial by jury.  As I explain below, conventional rational basis review is not the proper standard in this context.

30

## A.

In *Cleburne*, *supra*, 473 U.S. 432, the United States Supreme Court considered an equal protection challenge to a city ordinance that required a special permit for locating a group home for mentally retarded persons in a residential neighborhood. The high court began its analysis by examining whether mental retardation is a quasi-suspect classification calling for heightened scrutiny. (*Id.* at p. 442.) Observing that there are "real and undeniable differences between the retarded and others" (*id.* at p. 444) and that many federal and state policies specifically seek to benefit and address the needs of mentally retarded persons (*id.* at pp. 443–445 [discussing various education, habilitation, and antidiscrimination statutes]), the court expressed concern that "merely requiring the legislature to justify its efforts" in the terms required by heightened scrutiny "may lead it to refrain from acting at all" (*id.* at p. 444). For this reason, among others, the court "refus[ed] to recognize the retarded as a quasi-suspect class" and instead held that "legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose." (*Id.* at p. 446.) "This standard, we believe, affords government the latitude necessary both to pursue policies designed to assist the retarded in realizing their full potential, and to freely and efficiently engage in activities that burden the retarded in what is essentially an incidental manner." (*Ibid.*)

In applying this standard of review, the high court observed that the city ordinance required a special permit for a group home for the mentally retarded but not for many other uses, including apartment houses, multiple dwellings, boarding houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes, and private clubs. (*Cleburne*, *supra*, 473 U.S. at p. 447.) The court then proceeded to consider several possible justifications for this differential treatment. First, it noted that the Cleburne city council "was

31

concerned with the negative attitude of the majority of property owners . . . , as well as with the fears of elderly residents of the neighborhood." (*Id.* at p. 448.) The court rejected this rationale on the ground that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." (*Ibid.*, quoting *Palmore v. Sidoti* (1984) 466 U.S. 429, 433 ["Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."].)

Second, the city council was concerned that students at a nearby middle school "might harass the occupants" of the group home. (*Cleburne*, *supra*, 473 U.S. at p. 449.) The court said that "denying a permit based on such vague, undifferentiated fears is again permitting some portion of the community to validate what would otherwise be an equal protection violation." (*Ibid.*) Third, in response to the city council's concern that the group home would be located on a flood plain, the court said the possibility of a flood did not justify treating a group home for the mentally retarded differently from nursing homes, sanitariums, or hospitals. (*Ibid.*) The court was similarly unpersuaded by the city council's "doubts about the legal responsibility for actions which the mentally retarded might take," finding it "difficult to believe" that the group home "would present any different or special hazard" than boarding or fraternity houses. (*Ibid.*)

Fourth, "the Council was concerned with the size of the home and the number of people that would occupy it." (*Cleburne*, *supra*, 473 U.S. at p. 449.) The court again reasoned that it "is not at all apparent" why a group home for the mentally retarded "warrants a density regulation that others need not observe." (*Id.* at p. 450.) "At least this record does not clarify how . . . the characteristics of the intended occupants of the [group] home rationally justify denying to those

occupants what would be permitted to groups occupying the same site for different purposes." (*Ibid.*)  Finally, the city expressed concern about "avoiding concentration of population and . . . lessening congestion of the streets" as well as "fire hazards, the serenity of the neighborhood, and the avoidance of danger to other residents."  (*Ibid.*)  But the court said:  "These concerns obviously fail to explain why apartment houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit."  (*Ibid.*)

The high court concluded that "in our view the record does not reveal any rational basis for believing that the [group] home would pose any special threat to the city's legitimate interests" and thus invalidated the city ordinance as applied to the group home in that case.  (*Cleburne*, *supra*, 473 U.S. at p. 448.)  All nine justices in *Cleburne* agreed that the application of the city ordinance to require a special permit for the group home was unconstitutional.  The majority opinion reflected the views of six justices.  The other three justices would have gone further to hold that classification on the basis of mental retardation calls for heightened scrutiny and that the city ordinance was invalid not only as applied but also on its face.  (*Id.* at p. 478 (conc. & dis. opn. of Marshall, J.).)

I have presented *Cleburne*'s equal protection analysis in some detail because a careful reading of it confirms what many commentators have long observed:  In addressing a statutory classification based on mental retardation, *Cleburne* did not apply conventional rational basis review.  (E.g., Tribe, American Constitutional Law (2d ed. 1988) §§ 16–33, p. 1615 [*Cleburne* "appl[ied] heightened scrutiny, despite ostensible application of the minimum rationality test"]; Wilkinson, *The Dual Lives of Rights:  The Rhetoric and Practice of Rights in America* (2010) 98 Cal. L.Rev. 277, 296, fn. 117 [*Cleburne* "applied rational basis review with bite"]; Pettinga, *Rational Basis with Bite:  Intermediate Scrutiny by Any Other Name* (1987) 62 Ind. L.J. 779, 793–796 [same].)  As Justice

33

Marshall said, "Cleburne's ordinance surely would be valid under the traditional rational-basis test applicable to economic and commercial regulation." (*Cleburne*, *supra*, 473 U.S. at p. 456 (conc. & dis. opn. of Marshall, J.).) "To be sure, the Court does not label its handiwork heightened scrutiny," but "Cleburne's ordinance is invalidated only after being subjected to precisely the sort of probing inquiry associated with heightened scrutiny." (*Id.* at p. 458.)

Whatever the label, *Cleburne*'s analysis has two telling features that distinguish it from ordinary rational basis review. First, *Cleburne* repeatedly rejected the "one step at a time" rationale for requiring only the group home for the mentally retarded to obtain a special permit. There was nothing inherently irrational about the city's contention that the group home presented concerns about flood risks, legal liability, density, and congestion. What *Cleburne* found irrational was the city's failure to extend the permit requirement to other uses implicating the same concerns. This analysis defies the usual deference given to the legislature "to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination." (Maj. opn., *ante*, at p. 33.)

Second, *Cleburne* expressly noted that "the record" did not support the city's asserted justifications for treating the group home differently. (*Cleburne*, *supra*, 473 U.S. at p. 448 ["[I]n our view *the record* does not reveal any rational basis for believing that the [group] home would pose any special threat to the city's legitimate interests . . . ." (italics added)]; *id.* at p. 450 ["At least *this record* does not clarify how . . . the characteristics of the intended occupants of the [group] home rationally justify [differential treatment]." (italics added)].) *Cleburne*'s insistence on record support for the city's proffered rationales marks a clear departure from the ordinary rule that "legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data." (*Beach*

34

*Communications*, *supra*, 508 U.S. at p. 315.)  It was not irrational to speculate that the group home would present greater risks of legal liability or flood-related harms than other uses of the neighborhood.  Nor was it irrational for the city to argue that "the discrimination was really motivated by a desire to protect the mentally retarded from the hazards presented by the neighborhood." (*Cleburne*, *supra*, 473 U.S. at p. 455 (conc. opn. of Stevens, J.).)  But the high court declined to uphold the permit requirement on the basis of such rational speculation in the absence of record support.

**B.**

Since *Cleburne*, the high court has addressed a statutory classification based on mental retardation in one other case, *Heller v. Doe*, *supra*, 509 U.S. 312 (*Heller*), which involved an equal protection challenge to differences in the statutory procedures for involuntary commitment of persons alleged to be mentally ill and persons alleged to be mentally retarded.  Kentucky's civil commitment statutes required proof of mental illness beyond a reasonable doubt, but required proof of mental retardation only by clear and convincing evidence.  (*Id.* at p. 315.)  In addition, Kentucky law authorized guardians and immediate family members, whether friendly or adverse to the potential committee, to participate as parties in commitment proceedings based on alleged mental retardation but not in proceedings based on alleged mental illness.  (*Ibid.*)  A class of persons involuntarily committed on the basis of mental retardation challenged both statutory distinctions.

In its equal protection analysis, the high court applied rational basis review and described the standard at some length.  (*Heller*, *supra*, 509 U.S. at pp. 319–321.)  Quoting extensively from a broad range of cases examining social and economic legislation, the court returned to the propositions that the legislature "need not 'actually articulate at any time the purpose or rationale supporting its

35

classification' " (*id.* at p. 320), that the legislature "has no obligation to produce evidence to sustain the rationality of a statutory classification" (*ibid.*), and that "a legislature's generalizations" must be accepted "even when there is an imperfect fit between means and ends" (*id.* at p. 321). The court's opinion mentioned *Cleburne* once, simply noting: "We have applied rational-basis review in previous cases involving the mentally retarded and the mentally ill. See *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) . . . ." (*Heller*, at p. 321.)

Applying conventional rational basis review, the high court reasoned that Kentucky's different burdens of proof for mental illness and mental retardation could be justified on several reasonably conceivable grounds: the greater difficulty of diagnosing mental illness compared to diagnosing mental retardation, the greater accuracy of determining dangerousness based on past behavior in the case of mental retardation as opposed to mental illness, and the more invasive treatment to which the mentally ill are subjected as compared to the mentally retarded. (*Heller*, *supra*, 509 U.S. at pp. 322–326.) Four justices dissented from this part of the court's opinion, noting the absence of record support for any of the hypothesized rationales and citing numerous scientific authorities casting doubt on the generalization that treatments for the mentally retarded are less invasive than treatments for the mentally ill. (*Id.* at pp. 337–346 (dis. opn. of Souter, J.).)

As for Kentucky's different rules for participation of guardians and family members as parties in commitment proceedings, the high court said the distinction could plausibly be based on a greater need for privacy among persons diagnosed as mentally ill and on the greater likelihood that guardians and family members will have knowledge helpful to the trier of fact in the case of persons alleged to be mentally retarded as opposed to mentally ill. (*Heller*, *supra*, 509 U.S. at pp. 328–330.) On this point, three justices dissented, noting no record support for the court's speculative generalization concerning the privacy needs of the two groups.

36

(*Id.* at pp. 346–349 & fn. 9 (dis. opn. of Souter, J.).)  The dissenters also explained that even if guardians and family members are more likely to have knowledge helpful to the fact finder in cases of alleged mental retardation as opposed to alleged mental illness, "[t]he Court simply points to no characteristic of mental retardation that could rationally justify" the participation of guardians and family members not only as witnesses but as *parties* — in essence, "a second prosecutor" — in one proceeding but not the other.  (*Id.* at p. 347.)

It is evident, as the dissenters observed, that although "*Cleburne* was the most recent instance in which [the high court] addressed a classification on the basis of mental disability," *Heller* did not apply *Cleburne*'s analysis yet made no effort to distinguish it.  (*Heller*, *supra*, 509 U.S. at p. 337 (dis. opn. of Souter, J.); see *ibid.* ["While the Court cites *Cleburne* once, and does not purport to overrule it, neither does the Court apply it, and at the end of the day *Cleburne*'s status is left uncertain."].)  The closely divided court's unexplained departure from *Cleburne*, in which all nine justices endorsed at least the level of equal protection scrutiny applied by the majority opinion, detracts from *Heller*'s persuasive force in informing the proper interpretation of the equal protection guarantee under our state Constitution.  (Cal. Const., art. I, § 7, subd. (a); see *id*., § 24 ["Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution"].)

More to the point, the primary thesis of the court's opinion in *Heller* is that differences in commitment procedures reflect *real differences* between mental illness and mental retardation as opposed to "irrational prejudice against the mentally retarded" (*Cleburne*, *supra*, 473 U.S. at p. 450).  The problem, however, is that the critical question of whether a classification based on mental retardation reflects real differences as opposed to irrational prejudice cannot be reliably answered without at least the level of analysis undertaken in *Cleburne*.  Indeed, if

any reasonably conceivable state of facts could support such a classification, then the permit requirement in *Cleburne* should have been upheld. For there are many generalizations within the realm of rational speculation that could have supported one or several of the city's proffered justifications for distinguishing between mentally retarded persons and others. Without insisting on record facts to support those generalizations, there is no way to know whether they actually reflect real differences or simply assumptions consciously or unconsciously shaped by " 'a history of unfair and often grotesque mistreatment' " (*id.* at p. 454 (conc. opn. of Stevens, J.)).

The high court's observation in *Heller*, citing Blackstone and others, that "differences in treatment between the mentally retarded and the mentally ill . . . have long existed in Anglo-American law" further illustrates the point. (*Heller*, *supra*, 509 U.S. at p. 326; see *ibid.* ["At English common law there was a 'marked distinction' in the treatment accorded 'idiots' (the mentally retarded) and 'lunatics' (the mentally ill). [Citation.]"].) How are we to know whether such historical practices were grounded in real differences or in prevailing prejudices of the sort that the archaic and pejorative labels seem to imply? As Justice Souter said, "[s]urely the Court does not intend to suggest that the irrational and scientifically unsupported beliefs of pre-19th-century England can support any distinction in treatment between the mentally ill and the mentally retarded today." (*Id.* at p. 345, fn. 6 (dis. opn. of Souter, J.); see *ibid.* ["At that time, 'lunatics' were '[s]een as demonically possessed or the products of parental sin [and] were often punished or left to perish.' [Citation.] The primary purpose of an adjudication of 'idiocy' appears to have been to 'depriv[e] [an individual] of [his] property and its profits.' [Citation.]"].) It may well be that "there is a commonsense distinction between the mentally retarded and the mentally ill." (*Id.* at pp. 326–327 (maj. opn.).) But

38

common sense may sometimes be wrong, or it may provide no support for a particular legislative classification.

California is among the majority of states with separate commitment schemes for mentally ill and mentally retarded individuals. Traditionally, commitment statutes for the mentally retarded "provided less procedural protection than commitment statutes for the mentally ill and were less explicit with respect to commitment criteria . . . ." (Melton et al., Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (2d ed., 1997) p. 333 (Melton).) California's commitment statutes reflect the general pattern. As discussed earlier (*ante*, at pp. 16–19), the LPS Act as enacted in 1967 provided a right to counsel for persons alleged to be mental ill, and by 1970, the LPS Act guaranteed such persons facing prolonged commitment the right to demand a jury trial as well as an advisement of that right. By contrast, the section 6500 scheme did not include a right to counsel for persons alleged to be mentally retarded until 1975, and the right to a jury trial has been secured gradually through case law (see maj. opn., *ante*, at pp. 14–15 & fn. 14).

In explaining these disparities, one authority has observed that "the law's approach to people with mental retardation, premised on the irreversibility of their condition, was less solicitous of their property and person than was the case with people suffering from mental illness. In addition, there may have been an underlying assumption that people with mental retardation require less legal protection because they are more easily identifiable than people with mental illness and thus are less likely to be committed arbitrarily." (Melton, *supra*, at p. 333.) But the same authority concludes that such distinctions are "unjustified": "In reality, there is no reason for treating individuals differently based on their diagnosis as far as the legal structure for commitment is concerned. The line between 'mental retardation' and 'normal' intellectual and adaptive functioning is

39

as difficult to discern as that between 'mental illness' and 'mental health.' "
(*Ibid.*)

I would not go so far as to suggest that there must be strict equality between the commitment procedures applicable to mental illness and mental retardation. Such a broad rule, whether correct or not, is not necessary to decide this case. The question here is whether a difference in procedure concerning jury trial advisement can be justified on the basis of real differences between the two groups as opposed to some latent bias. As *Cleburne* recognized, that question cannot be answered by simply positing any reasonably conceivable state of facts concerning the two groups. Instead, the "record [must] clarify how . . . the characteristics of [persons facing commitment under section 6500] rationally justify denying to [them]" the advisement to which persons facing commitment under section 5300 are entitled. (*Cleburne*, *supra*, 473 U.S. at p. 450.)

## C.

The evolution of public policy and scientific understanding over the past half-century has not effaced the distinction between mental illness and mental retardation. Instead, it has reinforced the principle implicit in *Cleburne* that unsupported generalizations about any group based on mental disability carry a substantial risk of harm. As recounted above (*ante*, at pp. 16–19), legal reforms extending civil rights and other protections to persons with mental illness have tended to precede similar reforms affecting persons with mental retardation. But a number of developments since the 1970s, when section 6500 largely took its current form, have sought to counter the historic tendency to treat persons with mental retardation on the basis of categorical and unfounded assumptions of deficits and incapacities, and instead to enable each person to realize and act on his or her individual abilities.

The 1970s saw a wave of legislation advancing the rights of individuals with disabilities.  (See Rothstein & Irzyk, Disabilities and the Law (4th ed. 2012) pp. 4–7, 28–29.)  Congress enacted the Rehabilitation Act of 1973, which addressed vocational rehabilitation and employment opportunities for individuals with physical or mental disabilities.  (Pub.L. No. 93-112 (Sept. 26, 1972) 87 Stat. 355.)  Section 501 of the Rehabilitation Act requires nondiscrimination and affirmative action by federal employers (29 U.S.C. § 791), and section 503 of the act does the same for federal contractors (29 U.S.C. § 793).  Section 504 of the Rehabilitation Act — "the most significant federal protection for individuals with disabilities" until the Americans with Disabilities Act of 1990 (Rothstein & Irzyk, at p. 5) — requires nondiscrimination and reasonable accommodation by recipients of federal money (29 U.S.C. § 794), including schools, public facilities, transportation agencies, and health and welfare services.  These requirements reflect Congress's policy of "respect for individual dignity, personal responsibility, self-determination, and pursuit of meaningful careers, based on informed choice, of individuals with disabilities."  (29 U.S.C. § 701(c)(1).)

In 1975, Congress enacted the Education for All Handicapped Children Act, which exemplified the emerging principle of treating persons with disabilities on the basis of individual ability:  "It is the purpose of this Act to assure that all handicapped children have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs . . . ."  (Pub.L. No. 94-142, § 3 (Nov. 29, 1975) 89 Stat. 773.)  This legislation along with its successor, the Individuals with Disabilities Education Act (Pub.L. No. 101-476, § 901 (Oct. 30, 1990) 104 Stat. 1103), established the entitlement of each child with a disability to an individualized education program "tailored to a child's unique needs [and] designed by the school

district in consultation with the child's parents." (*Forest Grove School Dist. v. T. A.* (2009) 557 U.S. 230, 234, fn. 1; see 20 U.S.C. §§ 1412(a)(4), 1414(d).)

Also in 1975, Congress enacted the Developmentally Disabled Assistance and Bill of Rights Act, which called for individualized treatment and services: "The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty." (Pub.L. No. 94-103, § 201 (Oct. 4, 1975) 89 Stat. 486.) As a condition of receiving federal funding under this law and its successor statutes, each state is required to adopt a plan that assures, among other things, that "any direct services provided to individuals with developmental disabilities and funded under the plan will be provided in an individualized manner, consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities of such individual." (42 U.S.C. § 15024(c)(5)(G).)

In 1990, Congress passed the Americans with Disabilities Act (ADA), prohibiting discrimination against individuals with physical or mental disabilities. (Pub.L. No. 101-336 (July 26, 1990) 104 Stat. 327.) Notably, the ADA forbids discrimination based on "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." (42 U.S.C. § 12102(3)(A).) The workplace nondiscrimination and reasonable accommodation requirements of the ADA continue Congress's policy of ensuring that persons with disabilities are treated on the basis of their individual talents and abilities rather than their actual or perceived limitations. (42 U.S.C. §§ 12111(8), (9), 12112(b).)

Recent legislation has changed the language that statutes use to refer to individuals with disabilities. In 2010, Congress replaced the phrase "mental retardation" with "intellectual disability" in the federal codes. (Pub.L. No. 111-

256 (Oct. 5, 2010) 124 Stat. 2643.) Although such changes are sometimes disparaged as acts of political correctness, a Senate report explained: "[T]he terms 'mentally retarded,' 'mental retardation,' and variations of these terms, to describe individuals with intellectual disabilities are anachronistic, needlessly insensitive and stigmatizing, and clinically outdated. Terms to describe individuals with intellectual disabilities have gone through a steady evolution over the past two centuries, each iteration describing those living with the condition in a pejorative way. At the turn of the 20th century, people who were viewed as having limitations in intellectual advancement and social behavior were institutionalized. The prevailing sentiment at the time being that such people could not, should not, interact with people without disabilities. [¶] 'Imbecile,' 'moron,' 'idiot,' and 'feeble-minded' are all terms which have been used to reference people with cognitive disabilities by the public and in our Federal statutes. Each of these terms focused on perceived deficiencies to describe such individuals. The most recent term — 'mental retardation' — was used to characterize those with cognitive disabilities as having general diminished capacities for cognitive functioning. Physicians, advocates, and law makers now understand that this term does not accurately describe these individuals." (Sen.Rep. No. 111-244, 2d Sess., p. 2 (2010).) Just weeks ago, our Legislature similarly replaced the term "mental retardation" and related language with "developmental disability" throughout the section 6500 scheme. (Assem. Bill No. 1472, approved by Governor, June 27, 2012 (2011–2012 Reg. Sess.).)

All of these developments have sought to overcome the historical practice in our nation and our state of categorically treating persons with intellectual disabilities as incapable of understanding their own circumstances or participating in public institutions and civic life. To be sure, there are real differences between persons with such disabilities and others. Such differences, however, can only be

distinguished from entrenched and possibly unfounded assumptions by insisting on an actual, demonstrable basis — and not mere hypothesis or conjecture — for treating people differently because of that disability.

### D.

For the foregoing reasons, I would hold as a matter of state equal protection law that the *Cleburne* standard is the proper standard of review for evaluating statutory classifications based on mental retardation. Whatever *Cleburne*'s status may be as a matter of federal law after *Heller*, we have long noted that "our state equal protection provisions, while 'substantially the equivalent of' the guarantees contained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable." (*Serrano v. Priest* (1976) 18 Cal.3d 728, 764.) The independent vitality of our state equal protection guarantee has led this court to hold — upon canvassing judicial, legislative, and other historical developments in a similar manner as I have done here — that strict scrutiny applies to laws that discriminate on the basis of sexual orientation or gender, even though federal courts review such laws under less stringent standards. (Compare *In re Marriage Cases* (2008) 43 Cal.4th 757, 821–823, 843–844, and *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 17–20 with *Romer v. Evans* (1996) 517 U.S. 620, 631–635, and *Mississippi Univ. for Women v. Hogan* (1982) 458 U.S. 718, 724.) Consistent with this interpretive tradition, I conclude that *Cleburne*'s rational basis scrutiny applies as a matter of state law to distinctions based on mental retardation.

This court's equal protection jurisprudence has generally applied a two-tiered approach that subjects challenged classifications either to strict scrutiny or to rational basis review. Although *Cleburne* applied neither strict scrutiny nor conventional rational basis review, I do not see much to be gained by multiplying

44

labels to further differentiate among tiers of review. (Cf. *Cleburne*, *supra*, 473 U.S. at p. 451 (conc. opn. of Stevens, J.) ["[O]ur cases reflect a continuum of judgmental responses to differing classifications which have been explained in opinions by terms ranging from 'strict scrutiny' at one extreme to 'rational basis' at the other. I have never been persuaded that these so-called 'standards' adequately explain the decisional process."].) The essence of rational basis review is that a legislative classification "must be rationally related to a legitimate governmental purpose." (*Id.* at p. 446 (maj. opn.).) Like all doctrinal tests, this general requirement acquires greater specificity through application, and *Cleburne*, in my view, elucidates the proper application of rational basis review where a statutory classification is based on mental retardation as opposed to distinctions among cable television facilities (*Beach Communications*, *supra*, 508 U.S. 307), eye care professionals (*Lee Optical*, *supra*, 348 U.S. at p. 489), or tort victims (*American Bank*, *supra*, 36 Cal.3d at pp. 373–374).

In reaching this conclusion, I am mindful of *Cleburne*'s observation that policies "singling out the retarded for special treatment" are "in the vast majority of situations . . . not only legitimate but also desirable." (*Cleburne*, *supra*, 473 U.S. at p. 444.) Unlike strict or intermediate scrutiny, the rational basis test recognizes that "[e]specially given the wide variation in the abilities and needs of the retarded themselves, governmental bodies must have a certain amount of flexibility and freedom from judicial oversight in shaping and limiting their remedial efforts." (*Id.* at p. 445.) Nevertheless, it is appropriate that *Cleburne*'s skepticism toward unsubstantiated generalizations and legislative inconsistency applies equally to "remedial" laws that purport to benefit individuals with intellectual disabilities. For if there is any lesson to be learned from this area of history, it is that the injurious character of many benignly motivated policies became apparent only after objective inquiry or scientific advancement revealed

45

their unfounded premises for what they were. The officials who approved the sterilization of Carrie Buck, for example, seemed confident that they were doing so for her own good. (*Ante*, at p. 10.) It is possible that some policies we today regard as remedial will, upon finer inspection, come to be regarded tomorrow as unwarranted paternalism.

Although the court says *Cleburne* is "outmoded in this context" (maj. opn., *ante*, at p. 35, fn. 21), other courts have continued to rely on *Cleburne* for its approach to rational basis review even after *Heller*. (See, e.g., *Massachusetts v. U.S. Dept. of Health & Human Services* (1st Cir. 2012) 682 F.3d 1, 10–11 [citing *Cleburne* to show that "equal protection assessments are sensitive to the circumstances of the case and not dependent entirely on abstract categorizations"]; *Vision Mining, Inc. v. Gardner* (Ky. 2011) 364 S.W.3d 455, 466–469 [citing *Cleburne* in concluding that "the rational basis standard, while deferential, is certainly not demure"]; *Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund* (Wis. 2005) 701 N.W.2d 440, 461–462 [citing *Cleburne* in explaining that "[t]he rational basis test is 'not a toothless one' "].) In any event, even if *Heller* has "superseded" *Cleburne* (maj. opn., *ante,* at p. 35, fn. 21), the court provides no real analysis as to why *Heller* and not *Cleburne* should frame the standard of review that applies to discrimination on the basis of mental retardation under *state* equal protection principles — even though this issue has not previously been settled by our court, even though article I, section 24 of the California Constitution says that "[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution," even though we have adopted equal protection standards that are more stringent than federal standards in other areas, and even though the history of discrimination on the basis of mental retardation clearly distinguishes this kind of discrimination from ordinary economic and social legislation. Far from "crafting [my] own constitutional theory of equal

46

protection" (maj. opn., *ante,* at p. 35, fn. 21), I have provided an explicit and reasoned explanation as to why the *Cleburne* approach is appropriate here, using the same type of analysis that our court has used in the past when confronted with similarly novel equal protection issues. By contrast, the court simply does not engage this issue apart from asserting that "we have correctly applied [*Heller*]" and that *Cleburne*'s approach is "unduly strict" and thus improper here. (Maj. opn*., ante,* at p. 35, fn. 21.) We do not ordinarily decide important questions of constitutional law in such a conclusory manner.

### E.

Applying *Cleburne*'s principles to the instant case, I conclude that the record reveals no rational basis for requiring courts to provide a jury trial advisement to persons facing commitment under section 5300 but not to persons facing commitment under section 6500. *Cleburne*'s analysis forecloses reliance on a "one step at a time" rationale. If the difference in commitment procedure is to be sustained, it must be on the basis of a valid generalization about each group's ability to understand the advisement. But there are no legislative findings or other facts on record to support such a generalization.

There is nothing irrational about a conjecture that the proportion of mentally disordered persons facing a 180-day commitment under the LPS Act who can understand the advisement is greater than the comparable proportion among persons alleged to be mentally retarded under section 6500. But it is a mere conjecture nonetheless. As previously discussed (*ante*, at pp. 21–22), a person facing a 180-day commitment under section 5300 is a person actually (not allegedly) suffering from a mental disorder who has already undergone a 72-hour evaluation and treatment period (§ 5150) followed by a 14-day "intensive treatment" period (§ 5250) and possibly an "additional" 30-day period of "intensive treatment" (§ 5270.15). Despite such treatment, such a person is

alleged to "present[], as a result of mental disorder or mental defect, a demonstrated danger of inflicting substantial physical harm upon others." (§ 5300.) It is a fair inference that many such individuals are so mentally disordered that, even with treatment, they cannot understand a jury trial advisement. Meanwhile, given the range of cognitive abilities among persons diagnosed as mentally retarded and among persons merely "alleged" to be mentally retarded under section 6500, it is a fair inference that many such individuals are, with or without treatment, capable of understanding a jury trial advisement. (*Ante*, at p. 22.) The record before us provides no factual basis to determine whether the two groups really differ with respect to ability to understand an advisement and, if so, whether the difference is large or small.

Moreover, although the Legislature could have believed the benefits of an advisement requirement to be worth the administrative burden in section 5300 proceedings but not in section 6500 proceedings, there are no facts or findings in the record to support the rationality of such a legislative judgment. Of course, every procedural requirement presents an incremental burden. But it is not obvious how burdensome an advisement really is, especially when considered apart from any right to personal waiver. It is possible that a court reporter may be necessary to record the advisement. But there is no need for a competency hearing with respect to an advisement alone. Although some individuals will not understand an advisement, others will. If the efficiency of an advisement requirement were expressed as a ratio of its benefits to its burdens, the ratio would remain quite large even if the magnitude of the benefits varied from group to group, so long as the magnitude of the burdens was much smaller. The lack of any record indication of how burdensome it is to provide a jury trial advisement makes it difficult to conclude that the statutory distinction at issue reflects considerations

of administrative efficiency that merely "burden the retarded in what is essentially an incidental manner" (*Cleburne*, *supra*, 473 U.S. at p. 446).

Importantly, my analysis does not suggest that the Legislature is foreclosed from adopting different commitment procedures (short of procedures implicating a fundamental right) based on generalizations about persons who are mentally disordered and persons who are alleged to be mentally retarded. The problem in this case is that such generalizations lack any factual basis in the record that would dispel an inference of irrational prejudice, and thus the statutory distinction is invalid as presently drawn. However, the Legislature would remain free, in my view, to reenact the distinction if it were to articulate and provide some factual support for its classificatory rationale. (Cf. *Califano v. Goldfarb* (1977) 430 U.S. 199, 221–222 & 223, fn. 9 (conc. opn. of Stevens, J.) [finding Social Security survivors' benefit statute invalid because Congress "simply assumed that all widows [but not widowers] should be regarded as 'dependents,' " but leaving open the possibility that "an actual, considered legislative choice would be sufficient to allow this statute to be upheld"].) Legislative inquiry might reveal that most persons facing commitment under section 6500 are more than mildly retarded, that most persons facing commitment under section 5300 are not cognitively impaired, or that an advisement requirement presents administrative burdens that are not immediately obvious. When the Legislature has provided actual reasons and made findings to support a classification on the basis of mental retardation, the resulting statute is entitled to a high degree of deference. The Legislature may properly consider the efficiency of procedures designed to commit persons with mental disabilities who are dangerous to themselves or others, and a reviewing court should refrain from second-guessing the Legislature's actual, factually supported judgment that a particular classification is rationally related to a legitimate articulated purpose.

49

Finally, the term "irrational prejudice" (*Cleburne*, *supra*, 473 U.S. at p. 450) merits a brief comment. When it is said that a hypothesized yet unsubstantiated generalization is not sufficient to negate an inference of irrational prejudice, I do not think a necessary or even proper implication is that the policy in question was born of subjective animus. I would not suggest, for example, that the legislators who supported the enactment of section 6500 (or the citizens who elected those legislators) were motivated by ill will toward persons alleged to be mentally retarded. Instead, an irrational prejudice may, and most often does, arise from good-faith adherence to unexamined assumptions that reflect historic or prevailing attitudes. In recent decades, many legislative developments concerning involuntary commitment have perhaps reflected a widespread belief that because mental illness is less permanent and more treatable than mental retardation, people who are mentally ill are "closer to normal" than people who are mentally retarded. Whatever merit such a totalizing assumption may have as a general matter, it cannot alone — in the absence of relevant supporting facts — justify a particular legislative classification without taking on the character of an irrational prejudice in that specific context.

## F.

While holding that persons facing commitment under section 6500 have a right to a jury trial, today's opinion characterizes the advisement that Barrett seeks as an "ancillary," "collateral," or "additional adjunct" procedure. (Maj. opn., *ante*, at pp. 19, 24, 15.) Potential committees have a right to counsel (§ 6500), and the court says counsel "is presumed competent and informed as to applicable constitutional and statutory law" and "can be expected, where necessary or advisable, to consult with the client about jury trial concerns." (Maj. opn., *ante*, at p. 26.) This may be a pertinent response to Barrett's due process claim. But it is no answer to her equal protection claim because one could just as easily say that

50

the right to counsel adequately protects the jury trial right of individuals facing commitment under section 5300. Indeed, section 5302 requires a jury trial advisement even as it not only provides for a right to counsel but also expressly instructs that "[t]he attorney shall advise the person of his rights in relation to the proceeding . . . ."

It may be true that counsel generally knows best and that the option to demand or waive a jury trial will typically result in the same decision whether an advisement is given or not. But the importance of an advisement goes beyond its instrumental value. Whether or not an advisement alters the ultimate choice to proceed with or without a jury, it expresses the legal system's respect for the individual as a participant in, and not a mere object of, the commitment proceedings. For those who are capable of understanding it, an advisement by the court recognizes their dignity as well as their ability to comprehend and possibly participate in an important aspect of a proceeding that may adversely and irreversibly shape the rest of their lives. Having extended this recognition to some persons with mental disabilities, the Legislature must have an actual, considered rationale for not extending it to others.

In sum, the instant case implicates two sensitivities that run deep in the history of society's treatment of persons with intellectual disabilities. The first is an unfounded assumption of incapacity. As previously noted (*ante*, at p. 22), the section 6500 scheme does not assume that all individuals facing commitment lack the ability to comprehend an advisement. Nor should it assume, without supporting facts, that proportionally more persons lack such ability in proceedings under section 6500 than in proceedings under section 5300.

Second, the assumption of incapacity occurs in the context of a proceeding that may result in precisely the sort of isolation and segregation that reinforces and perpetuates the assumption of incapacity. As Congress recognized among its

51

findings when it passed the ADA, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be serious and pervasive social problem . . . ." (42 U.S.C. § 12101(a)(2).)

It is true that an order of commitment under section 6500 "expire[s] automatically one year after" it is made. (§ 6500.) But a person may be recommitted year after year, without limit, through procedures that are "the same as with an initial petition for commitment." (*Ibid.*) Where a trial court finds an individual to be mentally retarded — a condition that "never recede[s]" (maj. opn., *ante*, at p. 24) — and where the court also finds, as it did here, that "the danger she posed to herself and others was based upon, and caused by, her mental retardation" (*id.* at p. 7), the initial commitment proceeding and the findings made therein potentially lay the groundwork for lengthy, possibly even lifetime confinement. (See Melton, *supra*, at p. 334 ["the relatively stable nature of their condition" means hospitalization of people with mental retardation "could amount to confinement for life"].) Before being consigned to such a fate, a person alleged to be mentally retarded is entitled to the same advisement, and the same respect and recognition, that the Legislature has seen fit to grant other persons with mental disabilities who are facing prolonged commitment. That such respect and recognition may be "largely symbolic" (maj. opn., *ante*, at p. 35, fn. 21) does not diminish the importance of Barrett's claim, for it is evident from many historic claims of equality vindicated by our court and others that the principle of equal protection "often bears its fruit in those regions where symbol becomes substance." (Karst, *Equal Citizenship Under the Fourteenth Amendment* (1977) 91 Harv. L.Rev. 1, 6.)

## VI.

The Court of Appeal found that even if Barrett was entitled to advisement and personal waiver of her jury trial right, the error was harmless in light of the evidence of her mental retardation and dangerousness:  "There was no dispute that Barrett is a person with mental retardation.  And, given her recent history, as documented in the reports attached to the petition for commitment and the testimony of Robert Thomas, there was substantial evidence that she is a danger to herself or others, even though there was no evidence that anyone, as yet, had suffered actual and serious physical injury as a result of her behavior.  She regularly assaulted others and engaged in self-mutilation and suicidal ideation.  And though Barrett disputes it, there was undisputed evidence, as the trial court found, that her mental retardation is *a* substantial factor in her inability to control her dangerous behavior."

I agree with the Court of Appeal that the failure to advise was not structural error requiring automatic reversal.  The Court of Appeal applied the harmless error standard for federal constitutional error (*Chapman v. California* (1967) 386 U.S. 18, 24), but "application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law" (*id.* at p. 21).  Here, even if the Legislature violated the federal as well as state equal protection guarantee by failing to afford Barrett the same right to advisement afforded under section 5302, the error in Barrett's trial was the denial of a state statutory right.  If the Legislature were to correct the constitutional violation tomorrow by amending section 6500, any subsequent advisement error would be subject to state harmless error analysis.  The same is true today.  Applying *People v. Watson* (1956) 46 Cal.2d 818, 836-837, I would conclude on the basis of the evidence that there was no reasonable probability Barrett would have achieved a more favorable outcome had she been tried by a jury.

53

Accordingly, I join the court's disposition affirming the judgment of the Court of Appeal. But I would hold that Barrett is entitled to advisement of her right to a jury trial in any future proceeding under section 6500.

LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Barrett

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 181 Cal.App.4th 196
**Rehearing Granted**

_____

**Opinion No.** S180612
**Date Filed:** July 30, 2012

_____

**Court:** Superior
**County:** Santa Clara
**Judge:** Mary Ann Grilli

_____

**Counsel:**

Jean Matulis, under appointment by the Supreme Court, for Defendant and Appellant.

Deborah A. Dorfman and Sujatha Jagadeesh Branch for Disability Rights California, ARC of California, Capitol People First, Professor Robert Jacobs, Professor Michael Perlin and Olivia Raynor as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan, Dorian Jung, Seth K. Schalit and Lisa H. Ashley Ott, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jean Matulis
P.O. Box 1237
1241 Knollwood Drive, #119
Cambria, CA  93428
(805) 927-1990

Lisa H. Ashley Ott
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5978